735 A.2d 594

IN THE MATTER OF THE REVOCATION OF THE ACCESS OF
BLOCK NO. 1901, LOT NO. 1, BOROUGH OF PARAMUS,
BERGEN COUNTY PARKWAY 17 ASSOCIATES.

Superior Court of New Jersey
Appellate Division

Argued April 19, 1999—Decided August 6, 1999.

326

Before Judges HAVEY, SKILLMAN and LESEMANN.

*William J. Ward,* argued the cause for appellants Parkway 17 Associates (*Waters, McPherson, McNeill,* attorneys; *Mr. Ward,* of counsel; *Paul A. Conciatori,* on the brief).

*Lorinda Lasus,* Deputy Attorney General, argued the cause for respondent State of New Jersey, Department of Transportation (*Peter Verniero,* Attorney General, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Ms. Lasus,* on the brief).

The opinion of the court was delivered by

LESEMANN, J.S.C. (temporarily assigned).

Petitioner, Parkway 17 Associates (Parkway), owner of premises in Paramus, appeals from a decision of the Commissioner of the Department of Transportation,[1] which revoked Parkway's existing highway access permit concerning passage between its property and the southbound lane of State Highway Route 17. The DOT purported to act under authority of *N.J.S.A.* 27:7-94, which authorizes such a revocation provided that suitable "alternative access" is available. The DOT claims the existing access did not meet current access standards and that it provided suitable alternative

---

[1] The Department and the Commissioner will sometimes be referred to in this opinion, interchangeably, as the Department or DOT.

access. Parkway claims, however, that the proposed alternative access is unsuitable and does not comply with statutory standards. It also claims that the Administrative Law Judge (ALJ) who heard the matter, and the Commissioner who affirmed the decision of the ALJ, erred by unduly restricting Parkway's presentation in two respects: first, they refused to permit Parkway to explore a contract between the DOT and a major nearby landowner, Alexander's,[2] which Parkway claims improperly motivated the DOT to act as it did respecting its access; and second, they refused to consider an alternative access plan prepared by Parkway.

We conclude that, bearing in mind our normal deference to administrative fact finding and decision making, the decision of the Commissioner, based on the findings and conclusions of the ALJ, should be affirmed. We also conclude that neither the Commissioner nor the ALJ erred in refusing to permit Parkway to inject the Alexander's contract and negotiations into this proceeding and, while the ALJ and the Commissioner should have considered Parkway's alternative plan of access, the refusal to do so did not constitute prejudicial error. Thus, we affirm.

Parkway's property lies on the southbound side of Route 17, north of its intersection with Route 4 and just south of a side road (Century Road) which approaches from the west and intersects Route 17. The ramp connecting Century Road and Route 17 actually constitutes the northerly boundary of Parkway's property.

Parkway's building is a modern office building which was built in 1983 and which faces Route 17. Since it was constructed, it has had two entries and two exits onto adjacent streets. One, on Route 17, is near the southerly end of the property. The other is at the northerly end of the property, on the Century Road ramp.

To use these entry or exit points, southbound traffic on Route 17 would turn right, through an entry drive, and into the property

---

[2] Alexander's was the name of a major department store which operated on the nearby premises referred to, although it has since ceased operations and, at the time of the hearing, stood vacant.

and, when leaving, it would pass out an exit next to the entry and then turn right and join southbound Route 17 traffic. On the Century Road ramp, entry traffic would move from the eastbound lane of the ramp onto Parkway's property and, when leaving the property, would drive through the exit and onto the same eastbound ramp, and then proceed easterly to the ramp intersection with southbound Route 17.

The DOT says that as part of an overall, extensive reconstruction of the Route 17/Route 4 intersection, it undertook an examination of existing highway access locations in the area to determine compliance with present access standards. It acknowledges that Parkway's highway access did comply with applicable standards when its building was constructed in 1983, but it contends that it does not now comply with applicable codes. The essential problem with both the access point from the Century Road ramp and from southbound Route 17, involves the passage of vehicles entering or leaving Parkway's property, across and through a so-called "acceleration lane." As the ALJ described the problem:

> The ramp from Century Road to Route 17 southbound enables vehicles to accelerate from a relatively low speed to a highway speed on Route 17 southbound. In order for someone to use a driveway, they have to slow down from highway speed to a relatively low speed in order to leave the highway. Driveways on acceleration lanes are precluded because motorists on the acceleration lane are trying to go faster at the same time that other motorists are slowing down to enter the driveways.

The ALJ also referred to a visibility problem when vehicles pass through an acceleration lane to enter or leave adjacent property:

> There is also a problem with egress along an acceleration lane. Motorists on an acceleration lane look left to select a gap to get into the highway traffic. Driveways are on the right, so someone pulling out of a driveway on the right, while the motorists in the acceleration lane are looking to the left, also presents an unexpected problem. Both ingress and egress are precluded along acceleration lanes.

*N.J.S.A.* 27:7–94 deals with revocation of access permits. Its essential provisions read as follows:

> a. The commissioner may, upon written notice and hearing, revoke an access permit after determining that alternative access is available which meets the

standards provided in subsection c of this section for the property served by the access permit. . . .

* * *

c. For the purposes of this section, alternative access shall be assumed to exist if the property owner enjoys reasonable access to the general system of streets and highways in the State and in addition . . .

 (1) For property zoned or used for commercial purposes, access onto any parallel or perpendicular street, highway, easement, service road or common driveway, which is of sufficient design to support commercial traffic to the business or use, and is so situated that motorists will have a convenient, direct, and well-marked means of both reaching the business or use and returning to the high-way. . . . [3]

Thus, as all the parties agree, and as discussed further below, the statute sets out five criteria which must be met if an alternative access is to be deemed in compliance with the statute. The alternate access must be (1) "onto" a parallel or perpendicular street or highway; (2) of "sufficient design"; (3) "convenient"; (4) "direct"; and (5) "well marked."

The alternate access plan proposed by the DOT, which it contended (and the ALJ and the Commissioner found), complied with the statute, provided no direct access to the property from either Route 17 or the Century Road ramp. Rather, it called for southbound traffic on Route 17 to proceed past the existing entry point and beyond the southerly line of Parkway's property to a newly constructed entry point and road leading westerly off Route 17 identified as "Access Drive D." From that point, vehicles would proceed westerly on Access Drive D until that drive intersected with another newly constructed roadway, Access Drive F. At that point, vehicles would then turn northerly and proceed in that direction on Access Drive F until entering Parkway's property at one of two newly created entry points off Access Drive F, on the westerly side of the property. Vehicles leaving the property would exit from essentially those same two points on Access Drive

---

[3] N.J.A.C. 16:47–4.33, part of the State Highway Access Management Code, contains a provision essentially repeating the language of the statute and, for our purposes, adding no significant additional content.

F, and would normally proceed northerly on that road until Access Drive F intersected with the Century Road ramp, at which point the vehicles would turn easterly and then merge into southbound Route 17.

The newly created access route would also serve three properties lying south of Parkway's property but north of Route 4. In addition, both Access Drive D and Access Drive F—but primarily the latter—would also serve the Alexander's property. It was anticipated that Alexander's would be redeveloped with a 550,000 square foot retail mall. Vehicles leaving Alexander's, which is located at the northwest intersection of Routes 17 and 4, would reach southbound Route 17 by proceeding north out of the Alexander's property onto Access Drive F, and then north to the Century Road ramp, and hence east to join southbound Route 17.

Parkway maintained that the portion of the new access way that runs from a point in Access Drive F, just south of its intersection with the Century Road ramp, to the junction of that ramp with Route 17, was inadequate. The DOT, however, estimated the capacity of that strip of road as 2,000 "passenger cars per hour per lane," or PCPHPL.[4] It examined existing traffic volumes in the area, estimated new traffic that would be generated (mostly from the Alexander's development) and concluded that the estimated traffic volume would be slightly over 1,820 PCPHPL—approximately ninety-one percent of capacity, during the evening peak hours. On that basis, it concluded that the design was sufficient for the anticipated traffic load.

The DOT also estimated that the additional time which would be required for a vehicle to use the new rather than the pre-existing entry points to Parkway's property, would be approximately thirty-three seconds. It claimed that the alternate access was "onto"

---

[4] PCPHPL is a measure of highway capacity which begins with a count or estimate of vehicles passing a given point during a certain time period and then adjusts for the fact that some of the vehicles are passenger cars and some are trucks. It also adjusts for "geometry," including lane width, grades and distractions such as telephone poles, etc.

a parallel or perpendicular street; that it was of sufficient design; and that it was convenient and direct and could be "well marked." It thus concluded that the proposed alternate access met the statutory requirements.

I

Parkway claims that *N.J.S.A.* 27:7–94c(1) is unconstitutionally vague and thus void. As part of that claim, it also argues that the DOT failed in its obligation by not adopting specific regulations to define and implement the statute. It claims further that the DOT engaged in improper, informal "rule making" by applying dictionary definitions to some of the statutory terms without formally adopting regulations embodying those definitions. We find the arguments without merit.

There are some concepts which, by their nature, defy precise definition. The provisions of *N.J.S.A.* 27:7–94c(1) exemplify such concepts. The purpose of the statute, quite obviously, is to insure that a property owner is being treated fairly and equitably, and is not being deprived of reasonable use of that property, when the DOT determines to close an existing access point because it does not comply with current requirements. In determining whether the property owner is being treated fairly, general terms such as "convenient," "direct" and "sufficient design" are probably necessary in order to avoid narrow distinctions which, in a given case, might lead to technical compliance with the act, but nevertheless, frustrate the fair treatment which the legislature required. When the statutory objectives involve goals such as fairness and equity, specific draftsmanship which would be admirable when used in a document such as the Internal Revenue Code, may simply be inappropriate.

Our Supreme Court recognized that distinction in *New Jersey Ass'n of Health Care Facilities v. Finley,* 83 *N.J.* 67, 73–74, 415 A.2d 1147, *appeal dismissed and cert. denied sub nom. Wayne Haven Nursing Home v. Finley,* 449 *U.S.* 944, 101 *S.Ct.* 342, 66 *L.Ed.*2d 208 (1980). That case involved an administrative regula-

tion rather than a statute, but the principle is the same. The attack in *Finley* was on a provision requiring nursing home facilities to provide a "reasonable number" of beds for indigents. The claim was that the criterion was "unconstitutionally vague" because the statute provided no "adequate definition" of the term. The Court rejected the argument:

> It is fundamental that administrative regulations must ... be sufficiently definite to inform those subject to them as to what is required. At the same time, regulations must be flexible enough to accommodate the day-to-day changes in the area regulated.... We conclude that the standards used in the regulations are definite enough to be understood and followed and yet flexible enough to give the Department the necessary discretion to proceed on an individual basis weighing the particular circumstances of each nursing home.
>
> [*Id.* at 82–83, 415 A.2d 1147 (citations omitted).]

That reasoning applies here as well. The language is as specific as the nature of the case permits, but at the same time, it remains sufficiently flexible to give the DOT sufficient discretion "to proceed on an individual basis weighing the particular circumstances" of each case. *Id.* at 83, 415 A.2d 1147.

Nor do we find persuasive Parkway's argument that there is some impropriety in the DOT's use of dictionary definitions, or its claim that the DOT must adopt regulations providing more specific content to terms such as "direct," "convenient" and "of sufficient design." Those are general terms, and there is no indication that the Legislature used them as terms of art. Parkway submits no authority holding that an agency such as the DOT must adopt regulations to provide definitions that the Legislature saw fit not to provide, or that it is prohibited from using such ordinary aids to understanding as dictionaries of the English language. We see no reason why the DOT should be so limited.

The terms referred to are, as noted, every-day words used as part of our language. In general, their meaning seems clear. Difficulties may well arise in their application to specific fact situations, but that is not the same as attacking the use of the terms themselves. In our discussion below, we will deal with the DOT's application of those terms. As this point we note only that

there is nothing improper in its use of, or in its manner of defining, the words employed in the statute.

## II

Before discussing application of the statutory criteria it is well to recall, briefly, the standards applicable to a judicial review of administrative agency action.

 The issue when reviewing such a determination is whether there is a reasonable, sustainable basis for the agency findings and for the conclusion reached by the body charged by the Legislature with reaching that determination. A determination by an administrative agency carries a presumption of correctness. *Gloucester County Welfare Bd. v. New Jersey Civil Serv. Comm.,* 93 *N.J.* 384, 390, 461 *A.*2d 575 (1983); *Boyle v. Riti,* 175 *N.J.Super.* 158, 166, 417 *A.*2d 1091 (App.Div.1980). Administrative agencies are accorded wide discretion in selecting the means to fulfill specific functions delegated to them by statute. *Dougherty v. Department of Human Servs.,* 91 *N.J.* 1, 6, 449 *A.*2d 1235 (1982); *Texter v. Department of Human Servs.,* 88 *N.J.* 376, 383, 443 *A.*2d 178 (1982). A reviewing court will overturn a decision by an administrative agency only if it is determined to be arbitrary or capricious. *Gloucester County Welfare Bd., supra,* 93 *N.J.* at 390–91, 461 *A.*2d 575; *Barry v. Arrow Pontiac, Inc.,* 100 *N.J.* 57, 71, 494 *A.*2d 804 (1985); *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980). So long as there is substantial evidence in the record to support the findings and conclusions of the agency, a court will not interfere with or reverse the agency's decision, *Henry v. Rahway State Prison, supra,* 81 *N.J.* at 579–80, 410 *A.*2d 686; *Gerba v. Public Employees' Retirement Sys. Trustees,* 83 *N.J.* 174, 189, 416 *A.*2d 314 (1980), even if the record might also have supported contrary findings.

 Further, agency action is accorded even greater judicial deference when it falls within an area of expertise specifically assigned by the Legislature to a particular administrative agency.

*See, Public Interest Research Group v. State*, 152 *N.J.Super.* 191, 203, 377 *A.*2d 915 (App.Div.), *certif. denied*, 75 *N.J.* 538, 384 *A.*2d 517 (1977), where the court noted that review of an administrative decision is

> necessarily limited to a narrow function, namely, to determine whether there is sufficient evidence in the record as a whole to justify the determination reached below. Such a limited scope of review is particularly significant in this area of highly technical and scientific knowledge, wherein a court must accord a high degree of deference to the administrative agency and its expertise.

Those principles apply here. The Legislature has delegated to the DOT authority over highway access management in this state. *See N.J.S.A.* 27:7–89 et seq. By *N.J.S.A.* 27:7–91a, the Legislature required the DOT to adopt a State Highway Access Management Code to regulate access to state highways. Pursuant to those grants of authority, the DOT adopted the State Highway Access Management Code, *N.J.A.C.* 16:47–1.1 *et seq.*, originally in 1992 and thereafter by re-adoption in 1997. See generally, as to the functions and authority of the DOT and the applicability of the foregoing principles to highway access issues, *In re Route 206 at New Amwell Road, Block 161, Lot 13B (Hillsborough)*, 322 *N.J.Super.* 345, 731 *A.*2d 56 (App.Div.1999).

Further, in the hearing held in this matter, the DOT presented the testimony of Arthur J. Eisdorfer, a professional engineer and planner who is the Manager of the DOT's Bureau of Civil Engineering. He has been with the Department for approximately twenty-four years and has extensive experience in highway access design and implementation. His experience and credentials were unquestioned and, as the DOT emphasizes, he was acknowledged by Parkway's expert to be the leading expert in interpreting and applying the New Jersey Access Management Code.

In sum, in order to induce this court to reverse the findings and decision of the Commissioner (which were based on those of the ALJ), Parkway must demonstrate that those findings were without support in the record and were arbitrary and capricious. We do not believe it met those very stringent requirements.

## III

As noted above, *N.J.S.A.* 27:7–94c(1) incorporates five elements which must be satisfied in order for a proposed new access plan to constitute "reasonable alternative access." The new access must be:

1. "Onto any parallel or perpendicular" street, highway, easement, service road or common driveway;

2. That "parallel or perpendicular" way must be of "sufficient design to support commercial traffic to the" business involved;

3. It must be "convenient"; and

4. "Direct"; and

5. "Well-marked."

We are satisfied that with respect to each of those five criteria, there was ample evidence to support the ALJ's conclusion (adopted by the Commissioner) that the DOT had met its burden. We shall consider the five in order.

 1. The DOT maintains that the words "parallel" and "perpendicular" cannot be understood in a strict geometric sense since roads do not usually intersect at precise ninety degree angles or run parallel to each other, precisely the same distance apart at all points from beginning to end. Rather, the DOT says, a "perpendicular" road is considered to be one which intersects a highway and a "parallel" road is one which intersects the perpendicular road. Those conclusions make good sense, and we see no reason to reject them.

The dispute here is based on Parkway's claim that the DOT has interpreted the statute to permit the proposed new access to be separated from Route 17 by both a perpendicular street (or way) (Access Drive D and/or the Century Road ramp), *and,* an additional "parallel" roadway, Access Drive F. Its argument is that the alternate access must be by way of passage from Route 17 directly onto a "parallel" or "perpendicular" road which then provides access to the site. It bases its argument on the statutory word

"or," and argues that the DOT has impermissibly read that word as meaning "and."

The argument is not persuasive, nor need we indulge an argument as to whether the word "or" can sometimes mean "and." The fact is, the statute refers to access onto a parallel or perpendicular roadway. Here that access is onto Access Drive F, which should be treated as parallel to Route 17. The fact that there are "perpendicular" streets which lead from one of those parallel roads to the other, does not disqualify Access Drive F from meeting this requirement of the statute, nor do we understand any logical basis for an argument to the contrary. We are satisfied that the DOT clearly met the first of the five statutory requirements.

2. The "sufficient design" issue focuses primarily on the Century Road ramp which leads from Access Drive F to southbound Route 17. Parkway argues that the DOT was incorrect in its estimates of the capacity of that ramp and also in its estimates of the anticipated traffic volume, particularly during evening peak hours. Again, while there is room for debate on both those issues, we are satisfied there was more than ample evidence to justify the conclusions reached by the ALJ and the Commissioner.

The estimate of ramp capacity turned on highly technical issues such as the impact of the "merge" between Access Drive F and the ramp, plus that of the "weave," where the ramp traffic reaches that of Route 17; the proper conversion of passenger vehicle counts into PCPHPL; and the anticipated speed of vehicles traveling on that ramp. The State's traffic expert, Beth Angstadt, presented the numbers summarized above and concluded that the ramp was "of sufficient design" to support anticipated traffic. Parkway's expert, Michael Maris, reached contrary conclusions. The ALJ presented a rational, well thought out discussion of the competing testimony and concluded that the presentation by Ms. Angstadt was more persuasive. There was nothing arbitrary or capricious about that conclusion. It was supported by the evidence and thus requires affirmance, even though the record might

well have supported contrary findings as well. *See, e.g., Gerba v. Public Employees' Retirement System Trustees, supra*, 83 *N.J.* at 189, 416 *A.*2d 314.

One point on this issue requires some further comment. As noted, Access Drive F is intended to serve traffic moving from the mall, which will be built on the Alexander's property, to southbound Route 17 southbound. That mall is intended to contain approximately 550,000 square feet of retail space. The DOT estimated that at peak afternoon periods, approximately 1,142 cars per hour would leave that mall, with approximately one-third of them proceeding on Access Drive F. Parkway challenged those conclusions but, as noted, we are satisfied that they are reasonable and there was nothing improper in the ALJ's acceptance of them.

However, those numbers are obviously estimates. They could prove incorrect and, with the DOT estimating that traffic at the critical point will constitute ninety-one percent of capacity, there seems limited room for error. Although neither side argued or even mentioned the point, it would seem desirable that there be some contingency method for increasing capacity, or making other needed adaptations if the capability of the ramp from Access Drive F to Route 17 south should prove inadequate at peak periods.[5]

■ 3. and 4. The criteria of "convenient" and "direct" are interrelated and can best be considered together.

The DOT concluded (reasonably we believe) that the term "direct" should not be read as requiring an immediate passage from a state highway onto an abutting property. The reference to "parallel" and "perpendicular" roads indicates the likelihood that such passage will be via such a perpendicular or parallel road and then onto the property in question. That being so, the DOT defines the term "direct" consistent with a common dictionary

---

[5] Ms. Angstadt acknowledged that if the model used to estimate the fraction of the Alexander's traffic which would use Access Drive F proved incorrect, and more than one-third of that traffic used Access Drive F and the Century Road ramp, the traffic on the ramp would exceed its "design capacity."

definition to mean "relatively straight." It also concludes that the term "convenient," refers to the entry of vehicles onto the property itself, rather than the means of reaching the property.

The conclusion that the term "direct" means "relatively straight" is realistic. It implies a smooth passage from one point to another, without a multitude of turns or detours to reach one's destination. Here, although the distance from the pre-existing Route 17 entry, as one proceeds south on Route 17 and then through Access Drives D and F, totals close to one-third of a mile, it consists of one smooth, free flowing passage, bearing always to the right, with "free turns" as the vehicle moves to the newly designated access points. There is no detour, no complex passage from one intersecting street to another. There is nothing that could suggest the passage is "indirect" and, accordingly, we are satisfied that the newly designed access satisfies the statutory criteria of a "direct" means of access.

As to the "convenient" criterion, we are not convinced that the DOT's focus on convenience with respect to the interior of the tract excludes consideration of "convenience" in the means by which one enters the tract. In a sense, convenience and "direct" are similar terms as they describe movement from one point to another. Here, just as the required new passage is properly considered "direct," so too it is "convenient." And, as noted, the anticipated additional travel time is approximately thirty-three seconds.

As applied to the interior of the tract, as the DOT correctly notes, the entry points are aligned with existing traffic aisles within Parkway's property, and in that sense as well, the new access alignment satisfies the requirement of being "convenient."

5. Little need be said about the new access being "well-marked." The DOT has indicated a willingness to post whatever new signs might be required. Parkway objected to an initial indication of some markings being eliminated at the end of a one-year transitional period, but the disagreement seems minor and

certainly subject to resolution. It does not require further discussion here.

IV

On October 24, 1997, the DOT executed an agreement with Alexander's by which the two exchanged certain parcels of land related to the reconstruction of the Route 4/Route 17 interchange and the surrounding areas. Pursuant to that agreement, the DOT assured Alexander's of direct access to southbound Route 17. Under the subsequently approved plan, that access was to be provided by Access Drive F, leading from the Alexander's property to the Century Road ramp and then onto Route 17.

Parkway claims it never knew of that agreement until it obtained a copy thereof pursuant to the Freedom of Information Act. It argues that either it should have been permitted to participate in the negotiations, or the DOT should have negotiated with it in the same manner that it negotiated with Alexander's. It claims that by closing its pre-existing access points, the DOT, in essence, used it as a pawn in its dealings with Alexander's. In connection with the hearing before the ALJ, it sought to serve interrogatories on the DOT and depose DOT officials concerning the Alexander's agreement. The ALJ denied that relief.

Parkway cites no authority which would challenge the validity of the DOT agreement with Alexander's. Indeed, it does not flatly assert such invalidity and, if it sought to raise such a challenge, the claim should certainly have been made via a direct, rather than a collateral attack on the agreement.

We do not presume that the DOT or any official in the DOT acted for improper motives or in an improper manner in negotiating the agreement with Alexander's. So far as we can determine, and so far as is apparent from the agreement, it dealt with lawful state objectives. The DOT describes it as giving the State title to certain lands it needed to complete the Route 4/Route 17 improvement and in consideration thereof, giving certain other lands and rights to Alexander's. We see nothing improper in such an

exchange, and, as noted, if Parkway intended to challenge the agreement itself, it should have done so by a direct action.

Nor do we believe the DOT was required to permit Parkway to participate in some manner in its negotiations with Alexander's. Parkway cites no authority for that proposition, and it would seem almost self-evident that the presence or participation of a third party with interests different from either the State or Alexander's could not contribute to, and might well frustrate, the likelihood of any successful negotiation.

Nor has Parkway explained why, in any event, the State's agreement with Alexander's should have led the DOT to terminate its prior access rights and require it to use alternate access to its site. If Access Drive F was created, at least in part, to accommodate Alexander's, that would not mean that Parkway could not continue use of its Route 17 access to its property and/or its Century Road access to the property. And, of course, any determination by the DOT to terminate those access rights, regardless of any transaction with Alexander's, would still require the DOT to satisfy the mandate of *N.J.S.A.* 27:7–94c(1) and demonstrate the suitability of the proposed alternative access. In fact, as discussed further below, Parkway has presented its own alternate access plan, a variation on the DOT plan, which would leave Access Drives D and F in existence but also allow entry onto Parkway's property directly from Route 17 and the Century Road ramp. While the DOT rejects that alternate, we see no relationship between that rejection and the Alexander's agreement: the DOT could provide Alexander's with all it is obligated to provide under the agreement, regardless of whether it continues or discontinues Parkway's access ways on Route 17 and the Century Road ramp.

Discovery does not normally include the right to explore the mental processes of government officials respecting why they did or did not take a particular course of action or adopt a particular proposal. Generally, the action or the proposal must be judged on its own merits and its validity determined by the plan or the action itself, regardless of what may have been in the mind

of one or more officials who played some role in its adoption. We can see no reason why that general rule should not apply here, nor do we see any reason to permit the interrogatories or depositions sought by Parkway. The Alexander's agreement exists and can be read and evaluated for what it provides. It did not mandate the DOT action in terminating Parkway's prior access rights. At most, it may have had the incidental effect of creating a new possible alternate access route—Access Drives D and F, which could then make it possible for the State to do what otherwise might not have been practicable: require the elimination of two access points which it considered undesirable and nonconforming with applicable code provisions. If that was the effect of the Alexander's agreement, we see no impropriety or illegality therein. As noted, the DOT's action must be weighed and resolved on its merits and, on those merits and on that basis, we see no reason to overturn the decision of the Commissioner.

## V

Parkway also complains of the refusal of the ALJ, and thus the Commissioner, to consider its revised access plan. We agree that the alternate plan should have been considered, but we find the refusal to do so did not constitute prejudicial error.

This point is, in a sense, the converse of the proposition discussed above: that the statutory criteria which include standards such as "direct" and "convenient" are not precise, mathematical terms, but rather generally stated objectives. That being so, those terms may well be given more specific meaning and content when one proposed plan is compared or contrasted with the other. A proposed additional plan which is more "direct" or more "convenient" than one before the Commissioner, may well have an impact in determining whether the proposal under review can properly be deemed "direct" or "convenient." Thus, when a reasonable alternative is presented, fair treatment and realistic appraisal of the subjective and generalized terms of the statute

would normally call for the Commissioner to consider such alternatives in reaching a decision.

On that basis, Parkway's alternative plan should have been considered. However, examination of the plan makes clear that it would certainly have been rejected for essentially the same reasons that led to the initial determination to terminate existing access rights and require use of alternative access. The alternative plan submitted by Parkway involves precisely the same interweaving of accelerating traffic moving from the Century Road ramp toward Route 17, (moving from right to left to enter the main flow of Route 17 traffic), and that which is trying to move in the opposite direction, from left to right while decelerating to enter Parkway's property. That was the inherently unsafe maneuver (which also existed respecting the access directly from the Century Road ramp) which led the DOT to conclude that Parkway's existing access routes violated current codes and should be changed.

Parkway presents no rationale which could lead the Commissioner to accept its new proposal while, at the same time, it has rejected the pre-existing plan and required a new set of access points. Nor can we conceive of such a rationale. Thus, while it would have been better procedure for the Commissioner to consider the alternative presented by Parkway, and we would expect that in most proceedings the Commissioner would do just that, we see no harm in the rejection here since the proposal would inevitably have been rejected.

The action of the Commissioner, therefore, is in all respects, affirmed.