833 A.2d 670

TANURB, AN ONTARIO GENERAL PARTNERSHIP, PETITION-ER–APPELLANT, v. NEW JERSEY DEPARTMENT OF ENVI-RONMENTAL PROTECTION, RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 16, 2003—Decided October 29, 2003.

494

Before Judges COBURN, WELLS and FISHER.

*James P. Rhatican* argued the cause for appellant (*Connell Foley*, attorneys; *Kevin J. Coakley*, of counsel; *Mr. Coakley and Mr. Rhatican*, on the brief).

*Jason T. Stypinski*, Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey*, Attorney General, attorney; *Patrick DeAlmeida*, Deputy Attorney General, of counsel; *Mr. Stypinski*, on the brief).

The opinion of the court was delivered by

COBURN, J.A.D.

Tanurb appeals from a decision of the Commissioner of the New Jersey Department of Environmental Protection ("DEP"). The decision, which confirmed the ruling made by an Administrative Law Judge ("ALJ") after a six-day hearing, denied Tanurb's application to build a 15,600 square-foot addition to an existing retail center because it would unjustifiably eliminate 1.02 acres of the 1.35 acres of freshwater wetlands remaining on the site. We affirm.

I

On March 30, 1988, Tanurb bought the land in question for about $2,500,000, intending to build a 120,000 square-foot retail shopping center with an expected annual return on investment of fifteen percent. The site is in a developed area on the southbound lanes of Route 73 in Evesham Township, Burlington County. The purchase was made after the Freshwater Wetlands Protection Act, *N.J.S.A.* 13:9B–1 to 13:9B–30 ("FWPA"), was enacted but before its July 1, 1988 effective date.

Tanurb's environmental consultants delineated less than one acre as freshwater wetlands. Since freshwater wetlands were then regulated by the Army Corps of Engineers (the "Corps"), Tanurb applied to that agency for permission to fill .96 acres of wetlands. The Corps approved subject to Tanurb obtaining a letter of interpretation ("LOI") from the DEP verifying the wet-

lands boundary. In 1990, in response to Tanurb's request, the DEP determined that this site had approximately 2.4 acres of intermediate resource value freshwater wetlands.

On March 9, 1990, Tanurb applied to the DEP for a transition area waiver-averaging plan ("TAW–AP") to modify the standard 50–foot transition which would otherwise have been required around the meadow portions of these wetlands. The DEP granted this application conditioned on Tanurb recording a deed restriction prohibiting further disturbance of the modified transition area. This allowed for a project of somewhat reduced size; instead of a 120,000 square foot building, there would be two buildings about 300 feet apart, one consisting of 72,000 square feet on the north side of the meadow and the other of 8,000 square feet on the south side. The buildings were connected by a roadway about 600 feet long. This left about 1.35 acres of wetlands. Tanurb built the project while hoping to develop the remaining wetlands despite its promise to enhance their quality through planting programs. In an attempt to buttress its privately held future plans, Tanurb mistreated the wetlands and failed to record the required deed restriction.

In 1993, Tanurb applied to the DEP to expand the retail center. The application was denied by an Administrative Law Judge and then by the Commissioner because of Tanurb's failure to file the deed restriction and because it did not prove that there was a compelling public need for further development. No appeal was taken from that ruling.

In 1999, Tanurb submitted the subject application, seeking to construct a 15,600 square foot addition that would have resulted in the elimination of 1.02 acres of the remaining 1.35 acres of freshwater wetlands. It complained that the existing site is "effectively bisected by the impaired wetlands in question, creating a 'disjointed' environment." It offered evidence that some of its tenants wanted larger space in a physically integrated shopping center, which would draw more customers, and that its proposal would increase its return on investment. However, based on the

testimony of Tanurb's own financial expert, the return would only increase from 8.02% to 8.44%, a net gain of only .42%.

Although Tanurb introduced proof that these wetlands had been compromised, there was substantial evidence that Tanurb itself contributed to the deterioration by failing to enhance the quality of the land and by cutting down trees on it.

The record contains considerable evidence of alternatives that would have permitted some additional building without encroaching on the wetlands, all of which are detailed in the administrative decisions under review.

## II

On appeal, Tanurb contends that the statutory criteria for issuance of permits are unconstitutionally vague, that the Commissioner's findings of fact and conclusions of law are arbitrary, capricious, and unreasonable, and that the DEP should not have applied the compelling public need standard set forth in *N.J.A.C.* 7:7A–7.1(g). Although the ALJ used that regulation as an alternative basis for his decision against Tanurb, the Commissioner did not, endorsing instead the ALJ's finding that the permit should be otherwise denied on its merits. Since we are satisfied that the statutory criteria are sufficiently clear and the denial is supported by the evidence, we need not consider Tanurb's arguments that that regulation should not have been applied retroactively and that it is *ultra vires*.

■ Tanurb contends that the standards of *N.J.S.A.* 13:9B–9(b)(2) are unconstitutionally vague. More specifically, it argues that the statute's provisions allowing freshwater wetlands permits only if there is "no practicable alternative" and where there is a "minimum feasible alteration or impairment of the aquatic ecosystem" are standards "impossible to apply with any uniformity and objectivity."

*N.J.S.A.* 13:9B–9 sets forth the standards for the DEP to apply when considering a freshwater wetlands permit:

b. The department, after considering the comments of the environmental commission and planning boards of the county and municipality wherein the regulated activity is to take place, federal and State agencies of competent jurisdiction, other affected municipalities and counties, and the general public, shall issue a freshwater wetlands permit only if it finds that the regulated activity:

(1) Is water-dependent or requires access to the freshwater wetlands as a central element of its basic function, and has no practicable alternative which would not involve a freshwater wetland or which would have a less adverse impact on the aquatic ecosystem, and which would not have other significant adverse environmental consequences, and also complies with the provisions of paragraphs (3)-(9) of this subsection; or

2) Is nonwater-dependent and has no practicable alternative as demonstrated pursuant to section 10 of this act, [*N.J.S.A.* 13:9B–10] which would not involve a freshwater wetland or which would have a less adverse impact on the aquatic ecosystem, and which would not have other significant adverse environmental consequences; and

(3) Will result in minimum feasible alteration or impairment of the aquatic ecosystem including existing contour, vegetation, fish and wildlife resources, and aquatic circulation of the freshwater wetland; and

(4) Will not jeopardize the continued existence of species listed pursuant to "The Endangered and Nongame Species Conservation Act," P.L.1973, c. 309 (C. 23:2A–1 et seq.) or which appear on the federal endangered species list, and will not result in the likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of the United States Department of the Interior or the Secretary of the United States Department of Commerce as appropriate to be a critical habitat under the "Endangered Species Act of 1973," (16 U.S.C. § 1531 et al.); and

(5) Will not cause or contribute to a violation of any applicable State water quality standard; and

(6) Will not cause or contribute to a violation of any applicable toxic effluent standard or prohibition imposed pursuant to the "Water Pollution Control Act," P.L.1977, c. 74 (C. 58:10A–1 et seq.); and

(7) Will not violate any requirement imposed by the United States government to protect any marine sanctuary designated pursuant to the "Marine Protection, Research and Sanctuaries Act of 1972," (33 U.S.C. § 1401 et al.); and

(8) Will not cause or contribute to a significant degradation of ground or surface waters; and

(9) Is in the public interest as determined pursuant to section 11 of this act, is necessary to realize the benefits derived from the activity, and is otherwise lawful.

"A statute is presumed to be constitutional and will not be declared void unless it is clearly repugnant to the Constitution." *Newark Superior Officers Ass'n v. City of Newark,* 98 *N.J.* 212, 222, 486 *A.*2d 305 (1985). Furthermore, "the burden is on the

party challenging the constitutionality of the statute to demonstrate clearly that it violates a constitutional provision." *Ibid.*

A statute is unconstitutionally vague "if it is couched in terms 'so vague that men [and women] of common intelligence must necessarily guess at its meaning and differ as to its application.' " *State v. Lashinsky,* 81 *N.J.* 1, 17, 404 *A.*2d 1121 (1979) (quoting *Coates v. Cincinnati,* 402 *U.S.* 611, 614, 91 *S.Ct.* 1686, 1688, 29 *L.Ed.*2d 214, 217 (1971)). "The determination of vagueness must be made against the contextual background of the particular law and with a firm understanding of its purpose." *State v. Cameron,* 100 *N.J.* 586, 591, 498 *A.*2d 1217 (1985). The standard to determine vagueness is not mechanically applied and it depends in part upon the nature of the enactment. *Ibid.* Furthermore, the level of definitional clarity varies. Penal laws are subjected to "sharper scrutiny" and given "more exacting and critical assessment," while review of economic regulation is less strict because " 'businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.' " *Id.* at 592, 498 *A.*2d 1217 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 *U.S.* 489, 498, 102 *S.Ct.* 1186, 1193, 71 *L.Ed.*2d 362, 371–72 (1982)).

In *In re Revocation of Access of Block No. 1901, Lot No. 1, Bor. of Paramus,* 324 *N.J.Super.* 322, 735 *A.*2d 594 (App.Div.), *certif. denied,* 162 *N.J.* 664, 745 *A.*2d 1213 (1999), the State Department of Transportation (DOT) revoked the appellant property owner's existing highway access permit to access State Highway Route 17. *Id.* at 327, 735 *A.*2d 594. The DOT based its actions upon a statute that authorized an access permit revocation if a suitable "alternative access" was available. *Ibid.* The court rejected the appellant's claim that the statute was unconstitutionally vague, for these reasons:

There are some concepts which, by their nature, defy precise definition. The provisions of *N.J.S.A.* 27:7-94c(1) exemplify such concepts. The purpose of the statute, quite obviously, is to insure that a property owner is being treated fairly and equitably, and is not being deprived of reasonable use of that property, when the DOT determines to close an existing access point because it does not comply

with current requirements. In determining whether the property owner is being treated fairly, general terms such as "convenient," "direct" and "sufficient design" are probably necessary in order to avoid narrow distinctions which, in a given case, might lead to technical compliance with the act, but nevertheless, frustrate the fair treatment which the legislature required. When the statutory objectives involve goals such as fairness and equity, specific draftsmanship which would be admirable when used in a document such as the Internal Revenue Code, may simply be inappropriate.

[*Id.* at 332, 735 *A.*2d 594.]

The court favorably noted the Supreme Court's recognition of that distinction in *N.J. Ass'n of Health Care Facilities v. Finley,* 83 *N.J.* 67, 73–74, 415 *A.*2d 1147, *appeal dismissed and cert. denied sub nom. Wayne Haven Nursing Home v. Finley,* 449 *U.S.* 944, 101 *S.Ct.* 342, 66 *L.Ed.*2d 208 (1980), a case that "involved an administrative regulation rather than a statute, but the principle is the same." *In re Revocation of Access,* 324 *N.J.Super.* at 332–33, 735 *A.*2d 594. The attack in *Finley* was on a provision requiring nursing home facilities to provide a "reasonable number" of beds for indigents, and the vagueness claim asserted that the statute provided no "adequate definition" of the term. 83 *N.J.* at 82, 415 *A.*2d 1147. In rejecting the argument, the Court wrote this:

It is fundamental that administrative regulations must not only be within the scope of the delegated authority, but also must be sufficiently definite to inform those subject to them as to what is required. At the same time, regulations must be flexible enough to accommodate the day-to-day changes in the area regulated.

[*Ibid.*]

Analyzing the term "just and reasonable rate on equity," the Court wrote: "We conclude that the standards used in the regulations are definite enough to be understood and followed and yet flexible enough to give the Department the necessary discretion to proceed on an individual basis weighing the particular circumstances of each nursing home." *Id.* at 82–83, 415 *A.*2d 1147.

In applying the *Finley* Court's reasoning, the *In re Revocation of Access* court wrote: "The language is as specific as the nature of the case permits, but at the same time, it remains sufficiently flexible to give the DOT sufficient discretion 'to proceed on an individual basis weighing the particular circumstances' of each case." 324 *N.J.Super.* at 333, 735 *A.*2d 594.

Tanurb's assertion that subsections (2) and (3) above are unconstitutionally vague turns on the requirement that petitioner must prove that the proposal to fill freshwater wetlands "has no practicable alternative" and will result in "minimal feasible alteration or impairment of the aquatic ecosystem." As Tanurb recognized, the FWPA gave further contour to these terms in *N.J.S.A.* 13:9B–10, which established a rebuttable presumption against the two provisions that Tanurb challenges. The statute provided:

a. It shall be a rebuttable presumption that there is a practicable alternative to any nonwater-dependent regulated activity that does not involve a freshwater wetland, and that such an alternative to any regulated activity would have less of an impact on the aquatic ecosystem. An alternative shall be practicable if it is available and capable of being carried out after taking into consideration cost, existing technology, and logistics in light of overall project purposes, and may include an area not owned by the applicant which could reasonably have been or be obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity.

b. In order to rebut the presumption established in subsection a. of this section an applicant for a freshwater wetlands permit must demonstrate the following

(1) That the basic project purpose cannot reasonably be accomplished utilizing one or more other sites in the general region that would avoid, or result in less, adverse impact on an aquatic ecosystem; and

(2) That a reduction in the size, scope, configuration, or density of the project as proposed and all alternative designs to that of the project as proposed that would avoid, or result in less, adverse impact on an aquatic ecosystem will not accomplish the basic purpose of the project; and

(3) That in cases where the applicant has rejected alternatives to the project as proposed due to constraints such as inadequate zoning, infrastructure, or parcel size, the applicant has made reasonable attempts to remove or accommodate such constraints.

[*N.J.S.A.* 13:9B–10.]

From all of the foregoing, the Legislature apparently intended to create a difficult hurdle for permit applicants to meet, essentially requiring them to rule out all other reasonable alternatives before a freshwater wetlands permit would be granted. As with the DOT statute in *In re Revocation of Access, supra,* 324 *N.J.Super.* at 333, 735 *A.*2d 594, it is difficult to precisely define what a reasonable alternative might mean in every case. There, as here, the general terms used sufficiently directed the administrative

agency's action; consequently, the constitutional challenge to the statute must be rejected.

■ Tanurb also contends that the Commissioner's decision was arbitrary, capricious, and unreasonable because it ignored the impaired nature of the wetlands, which "cannot serve any of the recognized functions for which wetlands are protected," and ignored evidence that there existed no practicable alternatives to the proposed projects, given Tanurb's objectives.

Tanurb asserts that the subject property's wetlands serve none of the five functions of freshwater wetlands identified by the Legislature, relying on evidence that there was no animal life observed on the site except Canada geese and one mouse, that the site provided only a *de minimis* impact, if any, on the associated watershed and downstream waters, and that the site provided no flood or storm damage protection.

*N.J.S.A.* 13:9B–2 provides:

> The Legislature finds and declares that freshwater wetlands protect and preserve drinking water supplies by serving to purify surface water and groundwater resources; that freshwater wetlands provide a natural means of flood and storm damage protection, and thereby prevent the loss of life and property through the absorption and storage of water during high runoff periods and the reduction of flood crests; that freshwater wetlands serve as a transition zone between dry land and water courses, thereby retarding soil erosion; that freshwater wetlands provide essential breeding, spawning, nesting, and wintering habitats for a major portion of the State's fish and wildlife, including migrating birds, endangered species, and commercially and recreationally important wildlife; and that freshwater wetlands maintain a critical baseflow to surface waters through the gradual release of stored flood waters and groundwater, particularly during drought periods.

Tanurb's argument emphasizes these enumerated statutory purposes, to the exclusion of the restrictive, nine-part standard set forth in *N.J.S.A.* 13:9B–9(b). While these purposes outline the reasons that the Legislature sought to preserve wetlands, the statutory structure is to preserve all wetlands unless the rigorous standard allowing a permit is met. Thus, it is irrelevant whether significant wildlife had been observed on the site, or whether the site provided flood or storm damage protection.

It is, moreover, the applicant's burden to show that development on the site would not significantly contribute to degrading ground or surface waters. In the present case, the record supports the administrative conclusion that Tanurb failed to supply sufficient information with its amended application to allow the DEP to verify that water degradation would not occur. Tanurb's sketch assumed that the existing basin design, moved to the eastern edge of the property, would be sufficient. Its engineer had written to the DEP that the proposed basin would meet the regulatory requirement to detain 10% of the 1–year, 24–hour storm waters for 36 hours, and prevent degradation of the water quality downstream, but no engineered drawings were submitted for the basin's proposed relocation. According to DEP's expert testimony, Tanurb's proposal would create an "on-stream basin," because the basin would be located within the space that currently contained the drainage ditch, which would change the hydraulics significantly. Consequently, the record supports the finding that defendant's expert's testimony was not credible and the further finding that Tanurb failed to provide the necessary information to support its permit application.

In considering whether there were practicable alternatives to the proposed project, as required under *N.J.S.A.* 13:9B–9(b)(2) and *N.J.S.A.* 13:9B–10(b), Tanurb argues (1) that the DEP has no particular expertise in these real estate and business analyses, so the Appellate Division need not defer to the DEP's conclusions; (2) Commissioner's decision was flawed because it never expressly considered cost, existing technology, or logistics in reviewing the alternatives, as required by *N.J.S.A.* 13:9B–10 and by *N.J.A.C.* 7:7A–3.1(a)(1) and 3.3(c)(1)[1]; (3) the analysis of the off-site locations ignored credible evidence that no alternative sites existed that could reasonably accommodate Tanurb's purposes, and inappropriately redefined Tanurb's project objectives; (4) the analysis of on-site alternatives gave inappropriate weight to petitioner's

---

[1] These provisions are now recodified and amended at *N.J.A.C.* 7:7A–7.2(b) and (c); *see* 33 *N.J.R.* 3162 (September 4, 2001).

"fault" in the site's present design defects, made unworkable suggestions of adding an elevator, second floor retail space, or a boardwalk over the wetlands, and failed to mention the admission by a DEP expert witness that there were no feasible on-site alternatives for constructing 15,600 square feet of retail space other than by filling wetlands; and (5) no practicable no-build alternatives exist because the present structure may result in loss of tenants, certainly results in underutilizing the property, and creates market-driven lower rents for the smaller units in the center's southern building.

■ The record in this case supports the Commissioner's view that Tanurb failed to rule out practicable alternatives to the proposed project. Tanurb's basic proposal was to obtain additional retail space while also creating a more cohesive design. The Commissioner was well within his discretion to acknowledge that the original design was of Tanurb's own making, with full knowledge of the wetlands limitations. Thus, for example Tanurb's claim that adding a second floor now is cost-prohibitive must be tempered by considering that it could have initially built the center with two floors, or with a design that could accommodate adding a second floor later.

It does not take specialized knowledge to understand that Tanurb's own building and leasing decisions also affected the practicability analysis.

Furthermore, the Commissioner was well within his discretion to consider the "no-build" alternative to be practicable where the proposed expansion was expected to bring in only a negligible increase in rate of return, increasing by less than one-half of one percent.

Tanurb argues that the Commissioner gave undue weight to its "fault" in the initial design, but given the statutory presumption against construction in the wetlands, the Commissioner's approach appears correct. Otherwise, developers would be tempted to

design defective buildings requiring improvements that could only be made by additional construction in wetlands.

Consequently, we are satisfied that the record amply supports the Commissioner's conclusion that Tanurb failed to prove that there was no practicable alternative to its proposal to build on these freshwater wetlands.

Tanurb contends that because the site's wetlands are of low ecological value, the proposed project would result in "minimal feasible alteration or impairment of the aquatic ecosystem".

The focus here is on the "minimum feasible alteration or impairment" language of *N.J.S.A.* 13:9B–9(b)(3), one of the nine subsections setting standards for freshwater wetlands permits. Since Tanurb failed to meet the obligation to prove there is "no practicable alternative," satisfying this standard would not have required the DEP to issue a permit. This factor must be secondary to a determination that a proposal has no practicable alternative. Only then can the sole alternative be examined for minimizing its alteration or impairment of the aquatic ecosystem.

Affirmed.