878 A.2d 22 (2005)
379 N.J. Super. 331
In re FRESHWATER WETLANDS GENERAL PERMIT NUMBER 16.
In re Third Party Appeal by the Pinelands Preservation Alliance, New Jersey Audubon Society and the Natural Resources Defense Council of Freshwater Wetlands Statewide General Permit (DEP File Number XXXX-XX-XXXX.1, Pinelands Application Number 83-9233.09) Issued to Main Line Realty Group, L.L.C.
Superior Court of New Jersey, Appellate Division.
Argued November 8, 2004.
Decided July 29, 2005.
*23 Thomas A. Borden, Newark, argued the cause for appellants Pinelands Preservation Alliance, New Jersey Audubon Society and Natural Resources Defense Council (Rutgers Environmental Law Clinic, attorneys; Mr. Borden, on the brief).
Lewin J. Weyl, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (Peter C. Harvey, Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel, Mr. Weyl, on the brief).
Before Judges A.A. RODRÍGUEZ, CUFF and HOENS.
The opinion of the court was delivered by
CUFF, J.A.D.
This appeal concerns execution of a November 2000 settlement approved by the Pinelands Commission (Commission) and affirmed by this court in In re New Jersey Pinelands Commission Resolution PC4-00-89, 356 N.J.Super. 363, 812 A.2d 1113 (App.Div.), certif. denied, 176 N.J. 281, 822 A.2d 610 (2003). That dispute involved how to address the presence of timber rattlesnakes, an endangered species in this State, discovered within a residential development known as "The Sanctuary" in Evesham Township, Burlington County. The development is within the Pinelands area and subject to control by the Commission pursuant to the Pinelands Protection Act (the Act), N.J.S.A. 13:18A-1 *24 to -29, and the Department of Environmental Protection (DEP) pursuant to the Freshwater Wetlands Protection Act (FWPA), N.J.S.A. 13:9B-1 to -30, and implementing regulations.
Appellants Pinelands Preservation Alliance, New Jersey Audubon Society and the Natural Resources Defense Council appeal from two administrative agency actions: first, a freshwater wetlands general permit authorization issued by the Commission, and second, a decision by the DEP Commissioner denying appellants' request for a hearing to review the issuance of the general permit.[1] Appellants contend that the DEP Commissioner improperly delegated to the Commission the authority to issue the permit, that the permit issued is inapplicable to the site, and that the permit was improperly issued. We agree with the second and third contentions and reverse and remand for further consideration of the application, including the modified fence plan.
An overview of the Commission's role in overseeing development within the Pinelands, the regulation of freshwater wetlands within this State, and the interaction between the DEP and the Commission is in order.
Under the federal Clean Water Act, 33 U.S.C.A. sections 1251 to 1387(CWA), the federal government had exclusive regulatory control over the nation's freshwater resources. After enactment of the FWPA and its implementing regulations in July 1988, the DEP became authorized to grant permits for activities that could affect those waters. 33 U.S.C.A. § 1344; N.J.S.A. 13:9B-2, -9. Pursuant to the federal grant of authority, the DEP adopted regulations for Statewide General Permits, under which certain categories of activities could obtain more streamlined authorization; if a general permit did not apply, the activity could still be approved under an individual permit. N.J.A.C. 7:7A-9.1 and -9.2 (readopted and recodified as N.J.A.C. 7:7A-4 and -5); In re Freshwater Wetlands Prot. Act Rules, 351 N.J.Super. 362, 367-69, 798 A.2d 634 (App.Div.2002), aff'd, 180 N.J. 478, 852 A.2d 1083 (2004).
Meanwhile, in 1978 the federal government established the "Pinelands National Reserve" (Reserve) under the National Parks and Recreation Act. 16 U.S.C.A. § 471i. Congress found that "the Pinelands area in New Jersey, containing approximately 1,000,000 acres of pine-oak forest, extensive surface and ground water resources of high quality, and a wide diversity of rare plant and animal species, provides significant ecological, natural, cultural, recreational, educational, agricultural, and public health benefits. . . ." 16 U.S.C.A. § 471i(a)(1). To facilitate the protection of the Pinelands, Congress appropriated monies to New Jersey "for the acquisition of lands and waters or interests" and asked New Jersey to establish a planning entity to develop a comprehensive management plan (CMP) for the Reserve. 16 U.S.C.A. § 471i(h).
Accordingly, in 1979 the New Jersey Legislature enacted the Act, N.J.S.A. 13:18A-1 to -29. The Act created the Commission, the instrumentality having primary responsibility for planning in the Pinelands, and directed it to adopt the CMP "to serve as the land-use blueprint for the region. . . ." N.J.S.A. 13:18A-4, -8, -14; Gardner v. N.J. Pinelands Comm'n, 125 N.J. 193, 201, 593 A.2d 251 (1991). Under the Act, no development is *25 permitted in the Reserve unless it is reviewed by the Commission and found to be in conformance with the CMP. N.J.S.A. 13:18A-10(c); N.J.A.C. 7:50-4.2. County and local land use plans and ordinances must also conform with and implement the CMP. N.J.S.A. 13:18A-12. In 1980, the Commission adopted the CMP. N.J.A.C. 7:50-1.1 to -7.11.
In January 1993, the DEP and the Commission entered into a memorandum of agreement (MOA) "to establish a framework for the continued protection of wetlands within" the Pinelands. The MOA "does not create any substantive standards under which wetlands and waters will be regulated in the Pinelands Area" but is "solely intended to describe and allocate pre-existing areas of regulatory responsibility to avoid unnecessary duplication" between the Commission and the DEP. Recognizing that an FWPA permit is needed in addition to any approvals required by the CMP for activities involving the discharge of dredged or fill material in Pinelands area wetlands, the MOA provides that the Commission "on behalf of" the DEP "shall administer a process which may authorize regulated activities in waters of the United States in accordance with the Statewide General Permit program at N.J.A.C. 7:7A-9." The Commission, on behalf of the DEP, "may authorize these regulated activities within the Pinelands Area, in accordance with the requirements" of the Act, the CMP, and the rules adopted pursuant to the FWPA. The Commission agreed to provide the DEP with a monthly report describing all permit activity, and with copies of all denials of permit authorizations. On issues that arise under the FWPA rules, an applicant or other affected party "may request reconsideration" by the DEP Commissioner "on any decision to issue or deny an authorization made by the Pinelands Commission staff. . . ." If the matter does not fall within a general permit and an individual permit is required, the permit application will be made to the DEP after the applicant shows that it has completed the approval process before the Commission. The DEP shall not approve any action that would be inconsistent with the CMP.
In July 1998, the predecessors to the developer of "The Sanctuary" received final approval from the Planning Board to sections III, IV and V of the project. Pinelands Resolution, supra, 356 N.J.Super. at 367, 812 A.2d 1113. Soon thereafter, timber rattlesnakes were observed in the development and the Commission issued a call-up to review the Planning Board approval. Ibid. Litigation ensued, the matter was referred to the Office of Administrative Law, and all of the parties other than the appellants in this case reached a settlement. Id. at 367-69, 812 A.2d 1113. The agreement contained six primary features: (1) decrease the number of homes to be built by fifty-three; (2) change the layout to limit development on the south side of Kettle Run Creek; (3) maintain a sixty- to eighty-four-acre corridor along Kettle Run Creek, surrounding the known rattlesnake dens, using fencing and culverts, coupled with deed restrictions to maintain open space; (4) place $150,000 in an account to be used for inspecting and maintaining the culverts and fences, monitoring the snakes for fifteen years, relocating the snakes if necessary, and educating the residents on coexisting with rattlesnakes; (5) post another $40,000 in escrow in case additional fencing was necessary; and (6) sell at fair market price approximately 1100 acres of land to the DEP and another 133 acres to Evesham Township for Green Acres Preservation. Id. at 370-71, 812 A.2d 1113. The third feature, the installation of a fence to protect the snakes and to contain the snakes in their natural habitat, required regulatory *26 approvals, including permits required by the FWPA and a Stream Encroachment Permit. Id. at 372-73, 812 A.2d 1113. The Commission approved the settlement and the same groups that appear as appellants in these appeals also appealed the agency approval of the settlement. Id. at 371, 812 A.2d 1113. On appeal, this court affirmed the determination of the Commission to approve the settlement. We recognized that the wisdom of the fence and tunnels was subject to debate, but also noted that the settlement required the developer to obtain all necessary regulatory approvals. Id. at 372-73, 812 A.2d 1113. This appeal focuses on the issuance of the necessary permits by the Commission. We address the jurisdictional issue first.
In January 1993, the DEP and the Commission entered into an MOA that allocated regulatory responsibility for activities regulated by the FWPA within the Pinelands area. The MOA recognizes that activities within the Pinelands regions that trigger the need for an FWPA permit invariably require approvals pursuant to the Commission's CMP. Therefore, in accordance with the MOA, the Commission has been delegated the authority to administer "a process which may authorize regulated activities in waters of the United States in accordance with the Statewide General Permit program at N.J.A.C. 7:7A-9." The MOA is further memorialized at N.J.A.C. 7:7A-2.9(b)(c). Thus, if the regulated activity is subject to the Pinelands CMP and is eligible for a general permit under N.J.A.C. 7:7A, the Commission reviews the application under the CMP and under the standards established by the DEP for the issuance of the specific general permit. N.J.A.C. 7:7A-2.9(c)(1). Appellants contend that this delegation is improper.
The MOA cites N.J.S.A. 13:1D-9 as authority for the delegation. Section 9q provides that the DEP has the authority to "[c]ontract with any other public agency or corporation incorporated under the laws of this or any other state for the performance of any function under this act...." The Commission is a public agency, N.J.S.A. 13:18A-1 to -29, and regulation of freshwater wetlands is a function of the DEP. N.J.S.A. 13:9B-1 to -30. We interpret the statute as an explicit authorization of the type of relationship established by the MOA. We also note that the MOA expressly provides that DEP retains ultimate authority and oversight. Indeed, the Commission must provide to DEP a monthly report describing all permit activity and provide copies of denials of permit authorizations. In addition, an applicant or other affected person may request consideration by the DEP Commissioner pursuant to N.J.A.C. 7:7A-12.7 of any decision to issue or deny an authorization made by the Commission, although the Commissioner's review is limited solely to issues that arise under the FWPA. The retention of ultimate authority and oversight, including the opportunity for reconsideration by the Commissioner of FWPA issues, does not undermine the Legislature's intent to consolidate FWPA authority in the DEP.
This conclusion is underscored by the Supreme Court's recent decision, In re Freshwater Wetlands Protection Act Rules, 180 N.J. 415, 852 A.2d 167 (2004). This case involved a regulation authorizing the expansion of cranberry growing operations in the Reserve. Id. at 419, 852 A.2d 167. The Court was initially required to address the applicability of the FWPA in the Pinelands and ultimately agreed with the belatedly articulated position of the DEP that the FWPA permitting program applies to the Pinelands, at least in respect to the discharge of dredged or fill material. *27 Id. at 428-30, 852 A.2d 167. The Court concluded:
We find that the DEP has the authority under the FWPA to issue both general and individual permits allowing the discharge of dredged or fill material into wetlands situated in the pinelands. We observe, further, that N.J.S.A. 13:9B-6b expressly bars DEP enforcement of FWPA transition area requirements in the pinelands and leaves to the Pinelands Commission that regulatory responsibility.
[Id. at 429, 852 A.2d 167 (citations omitted).]
Nothing in this discussion suggests that the cooperative agreement between the DEP and the Commission created by the MOA is barred. The Court's attention was simply focused on whether the FWPA permitting program applies to the Pinelands. Thus, we conclude that the delegation of general permit review for activities encompassed by the FWPA and the CMP is permissible.
Having decided that the MOA is a permissible delegation of authority, we consider the contention that the Commission improperly granted the permit under GP 16. Paragraph 8 of the settlement agreement required the developer to install fencing surrounding the snake den. This activity was subject to receipt of all required approvals. This paragraph provides:
Main Line Realty Group, L.L.C. agrees to install fencing surrounding the den on or before April 15, 2001, subject to receipt of all required approvals, including any permit required pursuant to the Freshwater Wetlands Act or any Stream Encroachment Permit from the Pinelands Commission, the DEP or any other approving agency; a completed application will be submitted by Main Line Realty Group, L.L.C. on or before January 2, 2001. This fencing is to loop around the den and extend 400 feet beyond the existing basin located in section 2 of the Sanctuary, in accordance with the Fence Layout Plan and the Fence Detail Plan except as prohibited by Freshwater Wetlands and Stream Encroachment laws, rules and regulations. (emphasis supplied).
The agreement further provided that "[t]he exact location of the fencing and culverts may be adjusted from the location as shown on the Fence Layout Plan due to physical conditions in the field with the approval of the Pinelands Commission."
On March 22, 2001, the developer filed with the Commission an "Application for a Statewide General Permit to install fencing in accordance with" the November 3, 2000 settlement. Appellants submitted to the Commission certifications, dated February 26, 2000 and April 2, 2001, of a herpetologist (a reptile and amphibian expert), who opined that the undeveloped portions of The Sanctuary were critical habitat for a local population of timber rattlesnakes. He described his radio-tracking study of the snakes, which showed their use of two separate hibernation sites, or hibernacula, along Kettle Run Creek within The Sanctuary. The expert concluded that additional residential development within The Sanctuary would have adverse impacts on the critical habitat of the local timber rattlesnake population.
On April 5, 2001, the developer faxed to DEP revised plans for the proposed fence. These plans contain markings for termination points which appear to show that the fencing would end near the edge of the waters of Kettle Run Creek.[2] On April 11, *28 2001, appellants submitted detailed comments to the Commission and to the DEP objecting to the issuance of a GP 16 for the fence. Accompanying these comments were certifications from a professional planner and engineer, a hydrology and wetlands research scientist, and the herpetologist. Appellants contended that the application was incomplete because the developer had not submitted a certification that the proposed fence would not adversely impact swamp pink populations as required by N.J.A.C. 7:7A-9.5(a)(2)(iii), an explanation for the proposed vegetation clearing, and a report on impacts of the activity on threatened and endangered wildlife and plant species. In his certification, the planner and engineer opined that a stream encroachment permit was also required. The herpetologist explained that any gap in the fence would allow snakes to enter the residential development. The hydrologist opined that the fence would have hydrological impacts on the area and the permit application should have been accompanied by calculations based on measurements of the fence dimensions related to stream flow.
On April 12, 2001, Commission Assistant Director Harrison issued the GP 16 authorization letter. The letter included a jurisdictional finding and a single special condition. The special condition provided that "[t]he fencing shall comply with the terms and conditions of the settlement agreement approved by the Pinelands Commission on November 3, 2000 for the `Sanctuary' development." The authorization letter also stated that the permit was based on the fence plan dated October 12, 2000, as revised on November 2, 2000 and April 5, 2001.
Appellants argue that a GP 16 was not available because the application involved private lands, and the fence, as approved, departs materially from the plan described in the settlement agreement and approved by the Commission. As an appellate tribunal, we must also assure that there are adequate findings of fact to allow us to discharge our appellate function.
An appellate court reviews a final agency decision with deference, and will not reverse the ultimate determination of an agency unless the court concludes that it was "arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated legislative policies" expressed or implied in the act governing the agency. Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963). Courts extend substantial deference to an agency's interpretation of its own regulations. DiMaria v. Bd. of Trs. of Pub. Employees' Ret. Sys., 225 N.J.Super. 341, 351, 542 A.2d 498 (App.Div.), certif. denied, 113 N.J. 638, 552 A.2d 164 (1988). "An agency's interpretation of its own rule is owed considerable deference because the agency that drafted and promulgated the rule should know the meaning of that rule." Essex County Bd. of Tax. v. Tp. of Caldwell, 21 N.J. Tax 188, 197 (App.Div.2003) (citation omitted). However, "an agency may not use its power to interpret its own regulations as a means of amending those regulations or adopting new regulations." Venuti v. Cape May County Constr. Bd. of Appeals, 231 N.J.Super. 546, 554, 555 A.2d 1175 (App.Div.1989) (citations omitted).
Here, in the face of substantial opposition, the Commission issued a permit without a single finding of fact. The only portion of the authorization letter that appears to address appellants' opposition is a sentence referring to the source of its authority. There is no discussion of the efficacy *29 of the fence, its hydrological impact, or its wildlife and vegetation impacts. There is no discussion of the material alteration of the fence plan represented by the April 5, 2001 revision.
We note that the settlement agreement specifically made the settlement contingent on receipt of the requisite permits. In our opinion affirming the approval of the settlement, we noted that the public interest would be protected because "the settlement agreement requires the developers to obtain all necessary approvals, `including any permit required pursuant to the Freshwater Wetlands Act or Stream Encroachment Permit from the Pinelands Commission, the DEP or any other approving agency.'" Pinelands Resolution, supra, 356 N.J.Super. at 373, 812 A.2d 1113. In other words, we anticipated a permit process that would address the relevant concerns of the developer and appellants. The permit process was not intended to be a pro forma exercise; yet, the lack of any findings of fact coupled with an approval issued three weeks after the application was filed and one week after receipt of revised plans suggests that is what occurred.
Moreover, there is no discussion of the material alteration of the fence plan. As approved, the fence was to form a continuous loop between the snake habitat and the residential development. As approved, the fence terminates on either side of a waterway, thereby providing a path for the snakes from their protected habitat into the residential development, a circumstance that may negate the purpose of the fence. We recognize that Paragraph 8 allows for alterations to the fence plan due to field conditions. Our earlier opinion also noted that the fence could be considered an "experimental measure" and a "practical solution" to a problem that emerged during construction of the residential development. Ibid. Nevertheless, the April 5, 2001 revision is a material revision to the approved plan and should have been the subject of findings of fact by the Commissioner that reflected not only the degree of variation from the approved plan but also whether the revised plan would provide a practical remedy to the underlying problem.
Therefore, we are constrained to remand to the Commission for further proceedings. On remand, the Commission must provide findings of fact that support the issuance of the permit, that address the habitat and hydrology issues raised by appellants and appellants' contention that the Commission is without authority to issue a GP 16 for this activity on private lands, a position that for the following reasons appears to have substantial merit.
A general permit may issue for activities that will have minimal adverse environmental impacts, individually and cumulatively, on regulated areas, such as freshwater wetlands. N.J.S.A. 13:9B-23b; see Freshwater Wetlands Act, supra, 180 N.J. at 423, 852 A.2d 167. See also N.J.A.C. 7:7A-4.1(b)1. N.J.A.C. 7:7A-1.4 provides the following definition of "general permit":
A permit, adopted as a rule, under which the Department issues authorizations. A general permit may authorize regulated activities in freshwater wetlands, State open waters, and/or transition areas. An authorization issued under a general permit satisfies the requirement for a freshwater wetlands permit, open water fill permit, and/or transition area waiver, as applicable.
Here, the property owner applied for and was issued a permit to construct the fence in accordance with GP 16 which governs activities in protected areas for the purpose of habitat creation and enhancement activities. N.J.A.C. 7:7A-5.16.
*30 GP 16, as set forth in N.J.A.C. 7:7A-9.2(a) in the version effective on April 12, 2001, provided:
(a) Activities in freshwater wetlands and State open waters shall be authorized under the following Statewide General Permits and general permit 23, found at N.J.A.C. 7:7A-9.23, provided the activity complies with the requirements in (b) below; the conditions for all Statewide General Permits in N.J.A.C. 7:7A-9.3; and the Act [FWPA], this chapter, and the Federal Act [CWA]:
* * *
16. Fish and wildlife management activities which do not involve the discharge of more than 10 cubic yards of clean fill, carried out in publicly owned or controlled wildlife management areas, parks or reserves. These activities include, but are not limited to:
i. The placement of artificial nesting structures, nesting islands, observation blinds, sign posts, or fencing;

ii. The clearing, burning or removal of vegetation to increase habitat diversity or to control nuisance flora (when carried out in accordance with an approved wildlife management plan); and
iii. The blocking or filling of human-made drainage ditches for the purpose of restoring previously existing wetland conditions.
[emphasis supplied.]
The plain language of the regulation's limitation to activities "carried out in publicly owned or controlled wildlife management areas, parks or reserves" would not seem to apply to activities undertaken on private property.
The DEP asserts that the deed restriction and access easement show public "control" that would meet this standard. The easement here allows the DEP to have access to the affected lots "for the purpose of inspecting and maintaining the fence" and "for the purpose of installing, repairing or replacing the fence." There is no right specified to otherwise engage in wildlife management on the properties, such as observing or tracking the rattlesnakes or evaluating changes in their habitat. Although the law dictionary definition cited by the DEP refers to an easement as a right to "use or control the land" (emphasis added), the easement here provides only a limited right to use it, and does not include control. Although In re Protest of Coastal Permit Program Rules, 354 N.J.Super. 293, 365-68, 807 A.2d 198 (App.Div.2002), affirmed the DEP's right to use deed restrictions as a conservation strategy, that case does not discuss public "control," and therefore, does not support the DEP's argument. Accordingly, the limited nature of the easement in the present matter does not easily fit within the "publicly owned or controlled wildlife management areas" language.
The history of rule making regarding other general permits undercuts DEP's contention. GP 17 relates to trail or boardwalk construction, and both GP 16 and 17 were originally applicable to activities in "county, State, or Federal" areas. In the 1991 amendments, the rules for both general permits were changed to refer instead to "publicly owned or controlled" lands. 23 N.J.R. 338(a), 361 (February 19, 1991). The following comment and response appeared as to GP 17:
COMMENT: The rule at N.J.A.C. 7:7A-9.2(a)17 should be amended to delete the term "publicly owned or controlled" and replace it with "conservation areas" in order to allow this GP to be used on privately owned land (NAIOP).
RESPONSE: The rule will not be amended as suggested since the environmental *31 analysis of this general permit specifically addressed the impacts of this category of activities on publicly owned and controlled property and did not address the unlimited use of this GP on private lands. In addition, the GP is structured to facilitate the opportunities for educating the general public about the values and functions of wetlands. While privately owned lands may be partially designated for "conservation," these areas are not accessible to the general public.

[24 N.J.R. 1007, 1044 (March 16, 1992) (emphasis added).]
The DEP's response to the comment addressed the same issue raised here, regarding identical language for a different variety of freshwater wetlands general permit. In the face of this comment and response, it is difficult to accept the Commissioner's conclusion that the present matter involved "effectively publicly controlled" lands and that a GP 16 authorization was appropriate here. Rather, this appears to be a circumstance where the DEP is attempting "to interpret its own regulations as a means of amending those regulations or adopting new regulations." Venuti, supra, 231 N.J.Super. at 554, 555 A.2d 1175.
Moreover, the revised and currently applicable regulation governing GP 16 similarly does not appear to apply to this type of wildlife fencing on private lands. N.J.A.C. 7:7A-5.16 authorizes an issuance of a GP 16 for habitat creation and enhancement activities for programs for "the restoration, creation or enhancement of the habitat and water quality functions and values of wetlands" when those activities are "sponsored or substantially funded by" the named Federal or State agencies.
It appears that GP 16 was inapplicable to the present matter, and that instead this matter should have been brought to the DEP as an individual permit. Rather than exercise our original jurisdiction, we refer this issue to the Commissioner to allow the agency with the responsibility to issue such permits to explain why this particular application qualifies for a GP 16 permit under the regulations in effect at the time of application, March 21, 2001, or now.
Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] Appellants have not briefed this second appeal; therefore, the appeal docketed as A-1343-02T3 is dismissed. In re Bloomingdale Convalescent Ctr., 233 N.J.Super. 46, 48 n. 1, 558 A.2d 19 (App.Div.1989); Bolyard v. Berman, 274 N.J.Super. 565, 582 n. 6, 644 A.2d 1122 (App.Div.), certif. denied, 138 N.J. 272, 649 A.2d 1291 (1994).
[2] At oral argument, we were informed that the plan was revised to avoid the need for a Stream Encroachment Permit, although an application for that permit remained pending at the time of argument.