**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3381-17T4

IN THE MATTER OF RICARDO
MORA AND KELLI KENNY,
WATERFRONT DEVELOPMENT
PERMIT NO. 1517-12-0005.1 WFD
160001, CHALLENGED BY JAMES
BODENHEIMER.

_____

Argued September 25, 2019 - Decided October 30, 2019

Before Judges Koblitz, Gooden Brown, and Mawla.

On appeal from the New Jersey Department of
Environmental Protection, Permit No. 1517-12-
0005.1 WFD 160001.

Neil Yoskin argued the cause for appellant James
Bodenheimer (Cullen and Dykman, LLP, attorneys;
Neil Yoskin, of counsel and on the briefs).

Kevin J. Coakley argued the cause for respondents
Ricardo Mora and Kelli Kenny (Connell Foley LLP,
attorneys; Kevin J. Coakley, on the brief).

David Andrew Tuason, Deputy Attorney General,
argued the cause for respondent New Jersey
Department of Environmental Protection (Gurbir S.
Grewal, Attorney General, attorney; Jason W.

Rockwell, Assistant Attorney General, of counsel; David Andrew Tuason, on the brief).

Spector Gadon & Rosen, PC, attorneys for respondents Paul Rosen, Wendy Rosen, and the Wendy Rosen Trust (Johan Ashrafzadeh-Kian, on the brief).

PER CURIAM

James Bodenheimer appeals from the January 10, 2018 final agency decision of the Department of Environmental Protection (DEP), denying his December 1, 2016 request for an adjudicatory hearing to challenge a permit issued to his neighbors, Ricardo Mora and Kelli Kenny (Mora/Kenny), under the Waterfront Development Act (WDA), N.J.S.A. 12:5-3, and implementing Coastal Zone Management Rules (CZM Rules), N.J.A.C. 7:7. The permit, issued on October 12, 2016, approved the construction of a four-foot by 267-foot fixed dock on Mora/Kenny's adjacent property located on Long Beach Boulevard in Long Beach Township.

On appeal, Bodenheimer raises the following points for our consideration:

> I.[1] [BODENHEIMER] HAS STANDING TO BRING AN ADMINISTRATIVE APPEAL, AND THE DEPARTMENT INCORRECTLY DENIED HIS REQUEST FOR A HEARING AND A STAY PENDING THIS APPEAL.

---

[1] We have eliminated the point heading describing the standard of review and renumbered the remaining points accordingly.

A-3381-17T4

II. THE ISSUANCE OF THE PERMIT . . . WAS IN DIRECT VIOLATION OF THE DEPARTMENT'S OWN REGULATIONS DESIGNED TO PROTECT THE ENVIRONMENT AND MUST BE REVERSED.

    A. THE DEPARTMENT'S SHELLFISH HABITAT RULE REQUIRES THAT THE LOCATION AND SIZE OF THE PROPOSED DOCK BE ADJUSTED TO MINIMIZE THE AREA OF PROTECTED SHELLFISH HABITAT.

    B. THE DEPARTMENT'S SUBMERGED VEGETATION HABITAT RULE REQUIRES THAT THE LOCATION AND SIZE OF THE DOCK BE ADJUSTED TO MINIMIZE THE TOTAL AREA OF PROTECTED HABITAT COVERED BY THE STRUCTURE.

    C. THERE IS NO DE MINIMIS EXCEPTION FROM THE REQUIREMENT THAT THE SIZE OF THE PROPOSED DOCK BE MINIMIZED TO PROTECT THE MARINE ENVIRONMENT.

We affirm.

We glean the following facts from the record. Bodenheimer owns property located at lot 28, and Mora/Kenny own the adjacent lot immediately north of Bodenheimer's at lot 30. Both lots front Barnegat Bay, but Mora/Kenny's property has 125 feet of frontage while Bodenheimer's frontage is significantly narrower. In November 2015, Mora/Kenny submitted

3

applications to DEP for a waterfront development (WD) permit and a riparian license to construct a four-foot by 289-foot fixed dock on their property, projecting into Barnegat Bay. On December 3 and 12, 2015, Bodenheimer submitted letters to DEP, objecting to "the location and the length" of Mora/Kenny's proposed dock.

In his letters, Bodenheimer explained that he did not object to a prior permit, granted in 2012 to Mora/Kenny's predecessor in interest, because the permit approved a 165-foot dock "located approximately [sixty] feet north" of their shared boundary. However, according to Bodenheimer, Mora/Kenny's application located the dock "[sixteen] feet [n]orth" of their shared property line, which would only provide "[thirty-two] feet" of distance between Mora/Kenny's proposed dock and a dock Bodenheimer anticipated constructing on his property in the future, rendering navigation "in close proximity" to the two docks "difficult and possibly unsafe." Additionally, Bodenheimer asserted that Mora/Kenny's 289-foot proposed dock would "block the [n]orth/[s]outh channel" used by "boat owners in the neighborhood" to access "the inter-coastal waterway."

Bodenheimer's southerly neighbors, Paul and Wendy Rosen, owners of lot 26,[2] similarly objected to the location and length of Mora/Kenny's proposed dock, asserting that it would "exceed by over [forty] or [sixty] feet any dock on the coastal area of Barnegat Bay," including theirs. In letters to DEP dated November 25 and December 8, 2015, the Rosens objected to "the proposed dock's excessive length, hindrance of navigation or access to adjacent water areas, (which would violate N.J.A.C. 7:7-12.5), hindrance of existing navigational channels (which implicates N.J.A.C. 7:7-9.7), and the general loss of use and enjoyment that would be suffered by the inhabitants." They requested "a hearing to prevent the construction" of the proposed dock, and "as a nearby property owner within the class of persons enumerated in N.J.A.C. 7:7-24.3(b)(6), . . . notice of any revision, amendment, or other communication between the applicants and [DEP] in connection with [the] applications."

On February 10, 2016, DEP approved the application and issued a WD permit to Mora/Kenny, subject to certain pre-construction conditions. The permit allowed "any person . . . aggrieved by [the] decision" to "request a hearing within [thirty] days" after publication of the decision "in the DEP

_____

[2] The owners of lot 26 are Paul Rosen, Wendy Rosen, and the Wendy Rosen Trust.

Bulletin." In a March 14, 2016 e-mail, the Rosens' attorney, Johan Kian, communicated with Eric M. Virostek, DEP's Environmental Specialist in the Division of Land Use Regulation, requesting that DEP "reconsider its decision short of [the Rosens] filing a request for an adjudicative hearing." To support the request, Kian submitted a March 2, 2016 soundings plan for Mora/Kenny's proposed dock prepared by an engineering firm the Rosens retained. The Rosens' soundings plan purportedly showed that by relocating the proposed dock to the northern side of the property, "a [four-foot] depth could be attained using a substantially shorter dock than the one requested[.]" On March 24, 2016, Virostek responded that after comparing the Rosens' soundings plan with the engineering plan submitted with Mora/Kenny's application, he agreed that "if the dock was relocated to the opposite side of the property, it could have been slightly shorter, but only by approximately [ten to fifteen feet]."

On June 30, 2016, Mora/Kenny submitted a revised application to DEP, reducing the length of the proposed dock by twenty-two feet. Specifically, the application sought a permit for the construction of a four-foot by 267-foot dock with a four-foot by twenty-foot "'L' section at the waterward end." The supporting engineering plan confirmed that the proposed construction complied with all regulations, including the Shellfish Habitat Rule, N.J.A.C. 7:7-9.2, the

Submerged Vegetation Rule, N.J.A.C. 7:7-9.6, and the Navigation Channels Rule, N.J.A.C. 7:7-9.7. The plan stated that the proposed dock would "not result in a loss of navigability[,]" nor "extend into a navigation channel[,]" as "[t]he nearest authorized navigation channel [was] approximately [500 feet] water ward of the end of the proposed dock."

On October 12, 2016, DEP approved the revised application subject to certain pre-construction conditions, including Mora/Kenny's payment of $6,927.80 to "[DEP's] account for Shellfish Habitat Mitigation" in accordance with N.J.A.C. 7:7-9.2(d), and Mora/Kenny's receipt of "a tidelands grant, lease or license from the Bureau of Tidelands." As with the February 10, 2016 approval, the WD permit allowed an appeal of an aggrieved person within thirty days after publication of the decision in the DEP Bulletin in accordance with N.J.A.C. 7:7-28.1(b). The decision was published in the DEP Bulletin on November 2, 2016, and within thirty days of publication, Bodenheimer and the Rosens submitted separate requests for an adjudicatory hearing.

While those requests were pending, on December 7, 2016, the Tidelands Resource Council (Council) conducted a hearing on Mora/Kenny's application

7

for a riparian license, pursuant to N.J.S.A. 12:3-12.1.[3] At the hearing, the Council considered Mora/Kenny's application for "a [ten]-year revocable [riparian] license," required as a pre-construction condition of DEP's issuance of the WD permit, as well as the objections to the application interposed by Bodenheimer and the Rosens. Attorneys for Mora/Kenny, Bodenheimer, and the Rosens appeared at the hearing.

Mora/Kenny's attorney, Allyson Kasetta, acknowledged that the Council was not bound by DEP's issuance of the WD permit. However, she informed the Council that DEP's determination indicated that all "applicable regulations have been met" and "should be a strong indicator" that the proposed dock "does not, in fact, interfere with navigation or property rights, particularly because [Mora/Kenny] . . . made a good-faith effort to shorten the dock to 267 feet in light of the objections . . . raised." Specifically referring to the Rosens' soundings plan and their attorney's email exchange with Virostek, submitted as exhibits to the Council by the objectors, Kasetta disputed the Rosens' claim that relocating the dock "to the northern side of the property" could "potential[ly]

_____

[3] Under N.J.S.A. 12:3-12.1, the Council "is the public body responsible for the stewardship of the State's riparian lands[,]" pursuant to which the Council "determine[s] whether applications for the lease, license, or grant of riparian lands are in the public interest[.]"

. . . shorten the dock significantly." Because the proposed dock had already been shortened by twenty-two feet under the revised application, Kasetta stressed "[t]here would be no real difference in the length if it were to be relocated" as the Rosens requested.

Additionally, referring to the 2012 permit issued to Mora/Kenny's predecessor in interest for the construction of a 165-foot dock near the center of the property, according to Kasetta, even the Rosens' soundings plan showed that "there [was] no longer anywhere near sufficient depth at 165 feet in the center of the property" because of changes in "the physical circumstances." Kasetta also specifically refuted Bodenheimer's claim "that the location of the dock [was] an impediment to his property[,]" by reiterating that Mora/Kenny had complied with all applicable regulations governing the location, including ensuring that there was "a minimum of four feet from all property lines"[4] and "a minimum of eight feet of open water" separating docks.[5]

---

[4] N.J.A.C. 7:7-12.5(b)(7)(ii) requires "[c]onstruction and placement" of docks "a minimum of four feet from all property lines[.]"

[5] N.J.A.C. 7:7-12.5(b)(7)(i) requires "[a] minimum of eight feet of open water . . . between any docks if the combined width" of any existing or proposed docks "over the water exceeds eight feet."

A-3381-17T4

In turn, Bodenheimer's and the Rosens' attorneys objected to the application as "contrary to the public interest."  They asserted that "the Submerged Aquatic Vegetation Rule and the Shellfish Habitat Rule" required the applicant to "minimize adverse impacts to the maximum extent practicable[,]" which had not been done by Mora/Kenny.  They also claimed the proposed dock would adversely affect navigability.  According to the Rosens' attorney, if Bodenheimer built a dock on his property, crammed between the Rosens' and Mora/Kenny's dock, then the three docks would be "very close together" and would "create a lot of congestion in the area[,]" making it "difficult for the public to navigate in that area" and "causing conflict amongst the neighbors."  He argued that by Mora/Kenny building their dock "a few feet north" and "[thirty feet] shorter[,]" these problems would be alleviated.  Both attorneys asked the Council "to table th[e] application" until a determination was made by DEP on the respective hearing requests filed by both Bodenheimer and the Rosens.

After confirming that the timeline for Bodenheimer's construction of a dock on his property was undetermined, a Council member pointed out that the related objection was "all conjecture" based "on what[ was] going to happen in the future if . . . Bodenheimer builds a dock."  The Council member also stressed

that neither of the objectors adequately addressed whether Mora/Kenny's northern neighbor could lodge the same objections if the proposed dock was relocated to the northern side of Mora/Kenny's property as both objectors urged. At the conclusion of the hearing, the Council declined to table the application pending DEP's decision on the objectors' hearing requests, and voted unanimously to grant Mora/Kenny the riparian license to construct the proposed dock in accordance with the October 12, 2016 DEP WD permit.

Responding to Bodenheimer's objection directed to DEP, in a December 21, 2016 letter, Mora/Kenny opposed Bodenheimer's third-party request for a hearing, asserting Bodenheimer "failed to establish any statutory or constitutionally-protected property interest that would confer standing to pursue an adjudicatory hearing." Mora/Kenny also argued that Bodenheimer's "substantive challenges to the issuance of the [p]ermit [were] without merit." On January 11, 2017, Bodenheimer reiterated his objections to DEP and requested a stay of the permit. On January 10, 2018, DEP Commissioner Bob Martin denied "Bodenheimer's requests for an adjudicatory hearing and a stay," determining that Bodenheimer had no "standing" to obtain a hearing and his arguments opposing DEP's issuance of the WD permit to Mora/Kenny were

11

without merit.[6] The Commissioner also found no "good cause" as required under N.J.A.C. 7:7-28.3(b) to grant a stay.

Regarding standing, the Commissioner noted that DEP was "precluded from granting an administrative hearing unless Bodenheimer demonstrate[d] that he ha[d] either a statutory right to a hearing or a constitutionally protected property interest affected by the permit," neither of which was shown. According to the Commissioner, "the [WDA] does not provide a statutory right to a hearing for persons who are not applicants." Further, Bodenheimer "ha[d] not articulated any claim of a constitutionally protected individual property interest" affected by DEP's decision to issue the WD permit, "and none [was] apparent from a review of the hearing request."

The Commissioner explained:

> Bodenheimer claims only that the proposed [dock] will hinder navigation and will negatively affect the use and enjoyment of his property. However, "[f]ear of damage to one's recreational interest or generalized property rights shared with other property owners is insufficient to demonstrate a particularized property right or other special interest." Spalt[ v. DEP, 237 N.J. Super. 206, 212 (App. Div. 1989)]. Because Bodenheimer's claimed interests fall into this latter category, he does not have a particularized property interest sufficient to require an adjudicatory hearing.

---

[6] We were advised at oral argument that the Rosens' hearing request is still pending.

Finding that the proposed dock complied with "all applicable law and rules[,]" the Commissioner also rejected Bodenheimer's claim on substantive grounds. As to N.J.A.C. 7:7-12.5(b)(9), requiring that any "proposed structure not hinder navigation or access to adjacent water areas[,]" the Commissioner determined Mora/Kenny's application "adequately addresse[d] this criterion because the end of the approved [dock was] approximately 200 feet from the nearest authorized navigation channel used to access the neighboring docks and Barnegat Bay." Therefore, contrary to Bodenheimer's assertion, the Commissioner concluded the proposed dock was not "a navigation hazard" because there was "adequate room to navigate and access adjacent water areas." Further, according to the Commissioner, Bodenheimer's contention that the approved dock would "act as an impediment to accessing his property" was "speculative at best" because he "[did] not currently have a [dock] on his property."[7]

Turning to Bodenheimer's claims that the proposed dock violated N.J.A.C. 7:7-12.5(b)(2), requiring that the dock be designed to "minimize[] adverse

---

[7] The Commissioner noted that Bodenheimer's August 4, 2017 application for a WD permit to construct a four-foot by 234-foot dock on his property was approved by DEP on October 12, 2017.

environmental impact to the maximum extent feasible[,]"[8] and N.J.A.C. 7:7-12.5(c) and (d), requiring compliance with the "shellfish" and "submerged vegetation rule[s]," respectively, the Commissioner noted that the engineering plan accompanying the application "demonstrate[d] that the water depths on the northern portion of the [p]roperty [were] not significantly greater than the depths in the proposed location." This fact undermined Bodenheimer's entreaty to shorten and relocate the dock to the northern side of the Mora/Kenny property to resolve his concerns.

When dismissing Bodenheimer's claim that the proposed dock violated N.J.A.C. 7:7-9.6(b)(6), requiring that the proposed dock be constructed in such a way as to limit "impacts to submerged vegetation habitat at the site[,]" the Commissioner explained that "the [p]lan depict[ed] the proposed mooring area at a water depth of greater than [four] feet[,]" and "a shorter [dock] would not satisfy th[e] rule, as the mooring piles [were] located just outward of a measured

---

[8] In a related context, we explained that the phrase "to the maximum extent practicable[,]" qualifying the protection afforded in N.J.A.C. 7:7E-7.14 "reflects a balanced regulatory sensitivity to the physical, economic, and other pragmatic constraints that affect waterfront construction." In re Riverview Dev., LLC, Waterfront Dev. Permit No. 0908-05-0004.3 WFD 060001, 411 N.J. Super. 409, 435 (App. Div. 2010).

water depth of 3.6 feet."[9]  Thus, the Commissioner concluded that "there [was] no practicable or feasible way to reduce the length of the [dock] and still satisfy the [four]-foot depth requirement."

Likewise, in rejecting Bodenheimer's claim that the dock violated N.J.A.C. 7:7-9.2(d)(3)(i)(2), requiring that the proposed dock be constructed in a size "to limit . . . adverse impacts" to "shellfish habitat" to the maximum "extent practicable[,]" the Commissioner explained:

> The area of shellfish impacted is [1436] square feet of documented moderate density hard clam area and scallop production area. The [dock] will be constructed of non-polluting materials and no dredging will take place during construction of this project. . . .[10] Impact to shellfish habitat, including any impact that results because of the requirements to meet the submerged vegetation habitat rule, is addressed by mitigation of the shellfish habitat impact. Accordingly, the permit requires Mora/Kenny to make a monetary contribution to [DEP's] account for Shellfish Habitat Mitigation in the amount of $6,927.80 in accordance with N.J.A.C. 7:7-17.9.[11]  Thus Mora/Kenny's proposed [dock]

9  Under N.J.A.C. 7:7-9.6(b)(6)(vi), "[a] minimum water depth of four feet at mean low water must be present in the area where the boats will be moored[.]"

10   N.J.A.C. 7:7-9.2(d)(3)(i)(1) requires that "[t]he proposed dock" be "[c]onstructed of non-polluting materials[,]" and N.J.A.C. 7:7-9.2(d)(3)(v) prohibits "dredging . . . in conjunction with the construction or use of the dock[.]"

11   In accordance with N.J.A.C. 7:7-17.9, N.J.A.C. 9:7-9.2(m) provides that "mitigation for impacts to shellfish habitat and the marine ecosystem associated

minimizes impacts to shellfish habitat to the maximum extent practicable.

Upon concluding that shortening and relocating the dock to the northern side of the property, as urged by Bodenheimer, would not minimize impacts to submerged vegetation and shellfish habitats, the Commissioner stressed DEP did not direct applicants "where to site a [dock] so long as the proposed location otherwise complie[d] with the CZM Rules[,]" as it did here. This appeal followed.

Our role in reviewing the Commissioner's decision is limited. We "review[] a final agency decision with deference," In re Freshwater Wetlands Gen. Permit No. 16, 379 N.J. Super. 331, 341 (App. Div. 2005), and "will not reverse . . . unless: (1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record." Univ. Cottage Club

---

with the construction of a dock, . . . include . . . a monetary contribution to [DEP's] dedicated account for shellfish habitat mitigation." "[T]he monetary contribution . . . is based on the area of shellfish habitat covered by planned structures and mooring areas, the documented shellfish density supported by the local habitat, and the commercial value of the resource[,]" and "is intended to ensure that adverse impacts to the shellfish resource are minimized and habitat improvements are promoted in areas outside of the impacted area through the use of the mitigation funds." Ibid.

of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48 (2007) (citing In re Taylor, 158 N.J. 644, 656 (1999)). "This deference is even stronger when the agency, like DEP . . . , 'has been delegated discretion to determine the specialized and technical procedures for its tasks.'" In re Freshwater Wetlands Gen. Permits, 372 N.J. Super. 578, 593 (App. Div. 2004) (quoting Newark v. Nat. Res. Council, Dep't of Envtl. Prot., 82 N.J. 530, 540 (1980)).

"We also extend substantial deference to an agency's interpretation of its own regulations, reasoning that 'the agency that drafted and promulgated the rule should know the meaning of that rule.'" In re Orban/Square Props., LLC, ___ N.J. Super. ___ (App. Div. 2019), slip op at 20 (quoting Permit No. 16, 379 N.J. Super. at 341-42). "And, too, we do not reverse an agency's determination 'because of doubt as to its wisdom or because the record may support more than one result.'" In re Freshwater Wetlands Gen. Permits, 372 N.J. Super. at 593 (quoting In re N.J. Pinelands Comm'n Resolution, 356 N.J. Super. 363, 372 (App. Div. 2003)). Thus, "[a]lthough an appellate court is 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue,'" In re Carter, 191 N.J. 474, 483 (2007) (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)), "if substantial evidence supports the agency's decision, 'a court may not substitute its own judgment for the agency's

even though the court might have reached a different result[.]'" Ibid. (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).

Given these principles, we reject Bodenheimer's contention that the Commissioner's determination that he was not entitled to an adjudicatory hearing was "incorrect as a matter of law, and constitute[d] arbitrary and unreasonable actions." "A third-party objector's right to a formal administrative hearing is delineated and circumscribed by the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -25." In re Auth. For Freshwater Wetlands Statewide Gen. Permit 6, Special Activity Transition Area Waiver For Stormwater Mgmt., Water Quality Certification, 433 N.J. Super. 385, 406 (App. Div. 2013). "Although 'the APA does not foreclose such third parties from seeking judicial review of the merits of a permit once it is issued by an agency,'" id. at 406-07 (quoting In re Riverview Dev., LLC, 411 N.J. Super. 409, 425 (App. Div. 2010),

> the APA expressly prohibits a state agency from promulgating rules or regulations entitling a third party to an administrative appeal as a contested case under the APA unless "specifically authorized to do so by federal law or State statute," or unless a person "has [a] particularized interest sufficient to require a hearing on constitutional or statutory grounds."
>
> [Id. at 407 (quoting N.J.S.A. 52:14B-3.1(d), -3.2(c), -3.3).]

18

Thus, "[t]he rule is firmly settled that a trial-type adjudicatory hearing is not allowed in such matters except to an applicant who can show a statutory right or a constitutionally protected property interest." In re Waterfront Dev. Permit No. WD88-0443-1, Lincoln Harbor Final Dev., Weehawken, Hudson Cty., 244 N.J. Super. 426, 436 (App. Div. 1990). Here, Bodenheimer agrees that no provision of the WDA statute affords him any statutory right to a hearing. See Spalt, 237 N.J. Super. at 212. "Without a statutory right to a trial-type hearing, . . . objectors must show that they have a 'particularized property interest sufficient to require a hearing on constitutional . . . grounds.'" Gen. Permits, 185 N.J. 452, 463-64 (2006) (quoting N.J.S.A. 52:14B-3.1, -3.2). However, in Spalt, we held that "[f]ear of damage to one's recreational interest or generalized property rights shared with other property owners is insufficient to demonstrate a particularized property right or other special interest." 237 N.J. Super. at 212.

There, DEP refused to grant a hearing to shell fishermen who had a one-year leasehold in shellfish beds or to neighboring property owners challenging DEP's issuance of a Coastal Area Facility Review Act (CAFRA) permit to a corporate entity redeveloping a Barnegat Bay marina. Id. at 208-11. As to the neighboring property owners, we held that "simply because some of the

19

plaintiffs reside close to the proposed [marina] site and are fearful of resultant injury to their property, does not mean they are entitled to an adjudicatory hearing." Id. at 212. Further, because the shell fishermen could not show that any damage would result to them before the expiration of their shellfish bed leases, we concluded they did not possess a sufficient property interest to warrant an adjudicatory hearing. Id. at 212-13.

Similarly, in In re Amico/Tunnel Carwash, 371 N.J. Super. 199, 204 (App. Div. 2004), we held that adjacent landowners objecting to the construction of a car wash lacked a "particularized property interest" that triggered the right to a hearing before the Office of Administrative Law (OAL). There, a Secaucus service station owner applied to the New Jersey Meadowlands Commission (NJMC) for three bulk variances needed to construct a car wash on his property. Ibid. Adjacent landowners, a married couple who had participated in a hearing on the variances and had submitted expert reports opining that construction of the car wash would "create unsafe traffic conditions and have an adverse impact on the surrounding neighborhood[,]" appealed NJMC's approval of the variance application. Id. at 205-06.

Finding that any increased traffic congestion in front of their property was "similar to the impacts commonly experienced by owners of property in the

A-3381-17T4

vicinity of any proposed new development[,]" we held that the adjacent landowners did not have "a particularized property interest in [the service station owner's] development plan that entitle[d] them to [an adjudicatory] hearing." Id. at 212. See also Riverview Dev., 411 N.J. Super. at 411 (App. Div. 2010) (affirming DEP's denial of an adjudicatory hearing to townhouse residents challenging DEP's issuance of a WD permit to a high-rise developer on the ground that the residents, who complained that the proposed project would obstruct their views of the Hudson River and New York City skyline and worsen traffic near their dwellings, lacked a particularized property interest sufficient to require a hearing on constitutional grounds).

In General Permits, our Supreme Court reinforced these principles in upholding DEP's determination that neighboring property owners "had no statutory or constitutional right" to "a trial-type hearing" before the OAL "as part of the administrative permitting process." 185 N.J. at 456. There, Maramark Builders, LLC "intend[ed] to build single-family residences" on a seven-acre "undeveloped piece of property in Livingston Township . . . ." Id. at 455. "While seeking subdivision approval from the Livingston Township Planning Board, Maramark applied to [DEP] for a freshwater wetlands permit to fill a portion of 'isolated' wetlands on that property, pursuant to the Freshwater

Wetlands Protection Act (FWPA), N.J.S.A. 13:9B-1 to -30." Gen. Permits, 185 N.J. at 455. "[P]roperty owners and a community organization" objected "to the issuance of the permit on the ground that the wetlands [were] not 'isolated' and that filling them [would] exacerbate flooding conditions on their adjoining properties." Id. at 455-56.

After "extensively examin[ing] the wetlands issue over a two-year period[,]" DEP "issued Maramark a freshwater wetlands permit[,]" and rejected the neighbors' demand for an adjudicatory hearing. Id. at 456. On the neighbors' appeal, the Court applied the three-factor test enunciated in Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976) in order to assess the constitutionality of the administrative procedure and determine whether the third-party objectors lacked the particularized property interest entitling them to an adjudicatory hearing. In re Freshwater Wetlands Statewide Gen. Permits, 185 N.J. at 467.

The Court explained:

> The first Mathews factor is "the private interest that will be affected by the official action;" the second is "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and the last is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

[Ibid. (quoting Mathews, 424 U.S. at 335).]

The Court concluded that "DEP's administrative review procedures for the issuance of a freshwater wetlands permit satisfied traditional notions of due process." Id. at 456. Applying the Mathews factors, the Court "recognize[d] that the issuance of the freshwater wetlands permit was a preliminary stage of the approval process for the Maramark development[,]" and "[e]ven if [its] issuance . . . , by itself, would mean a greater run-off of water from the Maramark property, the adequacy of the drainage system" which "controlled whether there would be any additional flooding onto the neighbors' properties" was "primarily a matter for the Planning Board." Id. at 473. Further, "no additional procedural safeguards in the DEP's decision-making process were constitutionally required, particularly when measured against . . . 'the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" Ibid.

"Last, because the threat to the objectors' properties by the issuance of [the] permit [was] speculative, the objectors did not possess the type of 'particularized property interest' that entitled them to a trial-type hearing . . . ." Ibid. See also Permit 6, 433 N.J. Super. at 406-08 (affirming DEP's denial of neighboring property owners' request for an adjudicatory hearing to challenge

DEP's issuance of a freshwater wetlands permit in connection with Care One, Inc.'s expansion of its assisted living facility, which challenge was "premised on CareOne's project posing a threat of increased stormwater discharge to their properties" and failed to demonstrate "a particularized property right" giving "rise to a constitutional basis for granting a hearing").

Likewise, here, we agree with the Commissioner that Bodenheimer's claims that the proposed dock will hinder navigation and negatively affect the use and enjoyment of his property are the type of "generalized property rights shared with other property owners" that are "insufficient to demonstrate a particularized property right or other special interest." See Spalt, 237 N.J. Super. at 212. Further, DEP's decision-making process ensured compliance with the specific CZM Rules Bodenheimer asserts were violated. Additionally, because the threat to Bodenheimer's property would only potentially emerge upon his future construction of a dock on his property, we also agree with the Commissioner that the threat to Bodenheimer's property by the issuance of the WD permit was "speculative[.]" In re Freshwater Wetlands Statewide Gen. Permits, 185 N.J. at 473.

As the Court noted in In re Freshwater Wetlands Statewide Gen. Permits, "the administrative process provided . . . cannot be viewed in isolation[,]" but

24

should be considered "[i]n the totality of the circumstances . . . ." Id. at 471-72. Short of a trial-type OAL hearing, "[t]he Legislature has maintained significant avenues for third-party objectors to present their concerns about proposed permits to agency decision-makers before they reach a final determination on a permit application." Riverview Dev., 411 N.J. Super. at 425. Specifically, under N.J.S.A. 52:14B-3.1(a), "all interested persons are afforded reasonable opportunity to submit data, views or arguments, orally or in writing, during any proceedings involving a permit decision[.]" While "such oral presentations and written submissions are less formal than a contested case tried before an Administrative Law Judge," they still "provide an effective and efficient means for third-party objectors to voice their concerns with the State officials who will make the ultimate permitting decision." Riverview Dev., 411 N.J. Super. at 425.

Here, Bodenheimer availed himself of that opportunity in his written submissions to DEP objecting to Mora/Kenny's application before the permitting decision was made. Bodenheimer also participated in the hearing before the Council, which, while applying admittedly different substantive standards, considered his specific objections before determining whether the issuance of a riparian license required as a pre-condition to construction under the WD permit was "in the public interest[.]" N.J.S.A. 12:3-12.1. Thus, the

issuance of the WD permit to Mora/Kenny "was but one step in a larger permitting process" before Mora/Kenny could begin constructing the dock. Gen. Permits, 185 N.J. at 472.[12]

We also affirm the rejection of Bodenheimer's contentions that "[DEP] failed to adhere to the CZM Rules" by not requiring the construction of "a shorter dock" at an "alternative location" in order to "minimiz[e] impacts to Shellfish and Submerged Vegetation Habitat" for the reasons expressed in the Commissioner's comprehensive January 10, 2018 decision. We add only that our thorough review of the record convinces us that the Commissioner's decision was not "arbitrary, capricious, or unreasonable" and was "supported by substantial, credible evidence in the record." Univ. Cottage Club of Princeton, 191 N.J. at 48.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[12] Indeed, to satisfy additional pre-conditions to construction of the dock under the WD permit, on October 23, 2017, Mora/Kenny's application to the Army Corps of Engineers, the federal authority charged with issuing permits for construction activities affecting waters of the United States, was granted, and on February 23, 2017, Mora/Kenny granted an easement to DEP to comply with the Shellfish Habitat Rule.